**Mark A. HILDEBRAND and Mark L. Hildebrand, Plaintiffs–Appellants and Cross–Appellees,**

**v.**

**NEW VISTA HOMES II, LLC, Defendant–Appellee and Cross–Appellant,**

**and**

**Richard M. Reeves, Defendant–Appellee.**

**Nos. 08CA2645, 09CA0695.**

Colorado Court of Appeals, Div. IV.

Nov. 10, 2010.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2009.

Sullan[2], Sandgrund, Smith & Perczak, P.C., Scott F. Sullan, Curt T. Sullan, Leslie A. Tuft, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Fowler, Schimberg & Flanagan, P.C., Katherine Taylor Eubank, Jeffrey B. Stalder, Adam B. Linton, Denver, Colorado, for Defendants–Appellees and Cross–Appellant.

Opinion by Judge WEBB.

Plaintiffs, Mark A. (son) and Mark L. Hildebrand (father), purchased a new home being built by defendant, New Vista Homes II, LLC. After movement of the basement floor slab damaged the home, they sued both New Vista and co-defendant, Richard M. Reeves, its manager, under the Construction Defect Action Reform Act, sections 13–20–801 to –807, C.R.S.2010 (CDARA).· They pleaded negligence, negligent misrepresentation, violation of the Colorado Consumer Protection Act, sections 6–1–101 to –1120, C.R.S. 2010 (CCPA), and lack of statutory disclosure concerning expansive soils. They also pleaded breach of implied warranty against New Vista.

The court entered a directed verdict for Reeves. The jury returned a $540,754 verdict on all of plaintiffs' claims against New Vista. The court denied its motion for judgment notwithstanding the verdict (JNOV) and entered judgment. Plaintiffs moved for prejudgment interest, which the court granted in part and denied in part. Plaintiffs appeal and New Vista cross-appeals. We affirm in part, reverse in part, and remand for further proceedings against Reeves.

## I. Directed Verdict and JNOV

Plaintiffs contend the trial court erred by directing a verdict for Reeves. New Vista contends the trial court erred by denying its motions for directed verdict and JNOV on all claims. We agree with plaintiffs as to the negligence and negligent misrepresentation claims against Reeves, agree with New Vista as to the CCPA claim, and otherwise uphold the trial court's rulings.

We review de novo rulings on motions for directed verdict and JNOV. *Farmland Mut. Ins. Cos. v. Chief Indus., Inc.,* 170 P.3d 832, 838 (Colo.App.2007). A directed verdict is appropriate only where "the evidence compels the conclusion that reasonable jurors could not disagree and that no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained." *Brossia v. Rick Constr., L.T.D. Liability Co.,* 81 P.3d 1126, 1131 (Colo.App.2003). A JNOV can be entered "only if the evidence, viewed in the light most favorable to the nonmoving party, is such that no reasonable person could reach the same conclusion as that reached by the jury." *Archer v. Farmer Bros. Co.,* 70 P.3d 495, 499 (Colo.App.2002), *aff'd,* 90 P.3d 228 (Colo.2004).

The CDARA applies to all civil actions "claiming damages, indemnity, or contribution in connection with alleged construction defects." § 13–20–802; *see, e.g., Land–Wells v. Rain Way Sprinkler & Landscape, LLC,* 187 P.3d 1152, 1154 (Colo.App.2008). The statute was designed to regulate and streamline litigation against construction professionals. *Land–Wells,* 187 P.3d at 1154; *see* §§ 13–20–801 to –807, 13–80–104, C.R.S.2010. It does not alter the substantive elements of any common law claims. *Land–Wells,* 187 P.3d at 1154. But as relevant here, it limits a negligence claim based on noncompliance with industry standards to recovery of "actual damages." *See* § 13–20–806(1).

### A. Negligence

A builder has a duty to use reasonable care and skill in constructing a home, and the failure to do so constitutes negligence. *Hoang v. Arbess,* 80 P.3d 863, 867 (Colo.App.2003).

### 1. Plaintiffs' Evidence

Reeves and a financial partner owned New Vista. Reeves testified that he was its sole employee and was "responsible for running the company."

Reeves selected Terracon, a geotechnical engineering firm, to perform the soil investigations. Terracon prepared four reports on the subdivision and an individual report on each lot. The subdivision reports provided in relevant part:

- "[S]tructural basement floor systems are recommended."
- On some of the lots, "claystone bedrock was found to be moderately to highly expansive. We anticipate that the claystone bedrock will be encountered at or near basement floor slab bearing elevation.... If little or no movement can be tolerated, the use of a structural floor system ... is recommended as a positive means of eliminating the potentially detrimental effects of floor slab movement."
- "The use of structural floor systems ... is recommended for basement construction on the majority of the lots.... The use of a slab-on-grade floor system is generally considered acceptable for basement construction on Lots 39 though 41."

None of these reports recommended a slab-on-grade floor for Lots 1–38.

When plaintiffs purchased the home on lot 24, it already had a slab-on-grade basement floor, which, as defendants' counsel conceded at oral argument, Reeves had selected. New Vista built all homes in the subdivision on lots 1 to 38 with this type of floor.

Terracon's engineer testified that "slab-on-grade basement floor systems were not considered acceptable ... on lots other than 39 though 41 in Block 1." He added:

Q: Okay. And [Reeves] had asked you whether or not he could use slab on grade on lots—in the subdivision, correct?

A: Yes.

Q: Within [lots] 1 through 38, right?

A: Right.

Q: And you had told him no. You were recommending structural floors?

A: Yes.

The structural engineer selected by Reeves testified:

Q: Okay. Do you remember ever having had any discussions after having read the soils report with Mr. Reeves about, you know, slab on grade as risky or could be problems with it or anything—anything like that?

A: Well, I'm sure we had conversations to that effect. I'm not sure that—I think the consensus was the soils were somewhat expansive but not horribly expansive. So at any rate, *he wasn't going to build them with structural floors as I recall.*

(Emphasis added.)

Terracon's July 3, 2001 report on Lot 24 provided:

> To reduce the potential for perched groundwater to enter the basement of the residence and affect the foundation soils, exterior drain systems should be provided around the perimeter of the basement. The drainage system should be constructed around the exterior perimeter of each basement foundation, and sloped ... to a suitable outlet, such as a sump and pump system.

Reeves testified that he received this report, but decided not to install sump-pumps on some lots, including Lot 24:

Q: All right. You knew as the manager of New Vista, LLC that you weren't paying for pumps; right?

A: We did not.

Q: And you set the policy not to put pumps in the sump pits?

A: That's not true. If there was no water present, we didn't put a sump pump in. If there was water present, you put a pump in.

Q: That was your decision?

A: Yes, that was my decision.

Q: The soils report doesn't say if you [don't] see water the first day that you put the drain in, then you don't have to put a pump in; does it?

A: It does not.

### 2. New Vista

Notwithstanding this testimony, New Vista presents three reasons why the trial court should have directed a verdict in its favor on plaintiffs' negligence claim. We reject each reason in turn.

First, New Vista argues that because the purchase agreements allowed buyers either to assume the risks of a slab-on-grade floor or to choose a structural floor, the disclaimers in plaintiffs' purchase agreement barred their negligence claim.

Paragraph 13.a. of the purchase agreement provides:

> [T]here is a potential of expansive soils on the property which would cause cracking, heaving, breaking, vertical displacement, moisture and other adverse effects on the basement floor in the residence.

This paragraph describes two basement floor options—slab-on-grade or structural floor—and explains that "if [a structural floor basement] is selected, the additional cost of the basement floor system will be added to the purchase price ...." It warns:

> By making his selection of the type of construction for the basement floor, Purchaser has agreed to assume all liability for any cracking, heaving, breaking, vertical displacement, moisture, or other adverse effects on the Residence resulting from the type of basement floor construction selected by Purchaser in light of the soils conditions on the property.

Similarly, paragraph 13.b.(iii) provides:

> Purchaser acknowledges that Purchaser's choice has been made with full awareness of the risks attendant to such selection and the potential problems and damage which may occur to the Residence because of the Basement Floor System selected. Purchaser acknowledges that *the Soils Report recommends a structural basement floor for any finished or habitable space in the basement ....*

(Emphasis added.)

The jury was instructed:

> As an affirmative defense to [plaintiffs'] negligence claims, [New Vista] claims it disclaimed liability for any such negligence ... [in plaintiffs'] purchase contract ....

Even if the wording of these disclaimers might preclude a negligence claim, plaintiffs presented evidence from which the jury could have determined that these disclaimers did not apply to them.[1]

---

**1.** We express no opinion on plaintiffs' argument that the disclaimers are void for public policy reasons.

Under Paragraph 13.b.(iii), "Purchaser acknowledges that Seller has provided Exhibit F [DESCRIPTION OF BASEMENT FLOOR CONSTRUCTION ALTERNATIVES] to Purchaser." Exhibit F described "ALTERNATIVE I" as "a floating concrete slab-on-grade floor in the basement," which "is not to be selected for an area intended to be finished, and "ALTERNATIVE II" as a structural floor system, which "is the only alternative allowing for future finished or habitable space." However, the purchase agreement signed by plaintiffs had a line through Exhibit F and the notation "N/A."

In this regard, son testified:

Q: Did [the sales agent] show you Exhibit F to the contract as he was going through the contract?

A: Yes, he did.

Q: And what did he say to you about it?

A: When he presented it to me, it had the line through it with the NA and said that this, you know, it is not applicable.

Q: And did he explain why it wasn't applicable?

A: Yeah, he said this deals with the alternative floor flooring systems in the basement but the builder already selected the basement for your house so this doesn't apply.

Exhibit G of the purchase agreement, STRUCTURAL FLOOR ADDENDUM, provided:

Seller does not warrant now or in the future any basement finishing or represent any basement area as "habitable area." Purchaser acknowledges Seller has not had any involvement with Purchaser's decision to finish any basement area . . . .

It had also been crossed out with the notation "N/A."

Who had stricken out these exhibits was disputed. However, when Reeves signed the purchase agreement on behalf of New Vista, he noticed both strike outs.

■ New Vista's argument that the parol evidence rule precludes evidence contradicting the disclaimers is unpersuasive. That rule applies only to fully integrated contracts. *See, e.g., Coulter v. Anderson,* 144 Colo. 402,

410, 357 P.2d 76, 80 (1960). But where, as here, the face of the contract shows a change, the terms may be proven by evidence outside of the document. *See Walker v. Chatfield,* 126 Colo. 600, 605, 252 P.2d 109, 111 (1952) (where "the document showed evidence of its own incompleteness, . . . the trial court did not err in allowing evidence explaining the actual situation between the contracting parties"). Although the disclaimers had not been stricken, paragraphs 13.b.(i) and (iii) cross-referenced Exhibit F, and paragraph 3.b.(i) cross-referenced Exhibit G. Thus, because the strike-throughs created ambiguity, a reasonable jury could determine that the sales agent's explanation vitiated plaintiffs having initialed the slab-on-grade alternative and the pages with related disclaimers.

■ Second, we reject New Vista's argument that it cannot be held liable for the actions of independent contractors such as the soils engineer, the structural engineer, and the architect. *See Huddleston v. Union Rural Elec. Ass'n,* 841 P.2d 282, 287 (Colo. 1992) ("As a general rule, a person hiring an independent contractor to perform work is not liable for the negligence of the independent contractor."). A defendant can be liable for negligence if it fails to follow the recommendations of its independent contractors. *See Hoang,* 80 P.3d at 869 (finding negligence where defendant "directly disregarded some of the soils engineer's recommendations").

Here, plaintiffs presented expert testimony that New Vista had been negligent in constructing their home by failing to comply with the recommendations of those contractors:

Q: Based on your review of the basement, the reports and the other items you have described, did you reach a conclusion whether or not the builder in this case met the reasonable standard of care for builders when installing a concrete slab-on-grade basement floor in the basement?

A: I did.

Q: And what is your opinion?

A: [I]n my opinion there should have been a structural floor put in that—in the

basement to not affect movement and finish of the basement.

Q: Based upon that, did you conclude whether or not the builder met the standard of care?

A: No, the builder did not meet the standard of care.

This expert also testified that New Vista failed to "meet the standard of care by failing to install a pump as required by the soils report and as good construction practice." Defendants presented no contrary expert testimony.

Third, we reject New Vista's argument that the recommendations in Terracon's subdivision reports were irrelevant because the specific report for plaintiffs' lot stated the "use of a slab-on-grade floor system could be considered."

■ Reeves testified that early on in the project, he understood Terracon to be recommending structural floors for lots 1–38. The Terracon engineer testified to having told Reeves that he was "not backing off of [the structural flooring] recommendation" on these lots. Further, the report on plaintiffs' lot also said: "other portions of the site include claystone" that is "moderate to highly expansive"; this claystone "will be encountered at or near basement floor slab elevation"; and a structural floor is "recommended as a positive means of eliminating the potentially detrimental effects of floor slab movement." To the extent that these statements conflicted, "it is the function of the jury to assess the credibility of witnesses, evaluate and weigh the evidence presented, and determine the facts of the case." *Jenkins v. Jacobs*, 748 P.2d 1318, 1321 (Colo. App.1987).

Accordingly, because a reasonable jury could have rejected New Vista's position that it merely let "the [plaintiffs] decide whether to purchase a home with a slab-on-grade basement floor," we conclude that the trial court did not err by sending plaintiffs' negligence claim against New Vista to the jury.

### 3. Reeves

We agree with plaintiffs that the trial court should have allowed the jury to consider whether Reeves was negligent.

■ "Corporate agents are liable for torts of the corporation if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct." *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 28 (Colo.App.2010). Such an agent may "be held personally liable for his or her individual acts ... even though committed on behalf of the corporation, which is also held liable." *Hoang*, 80 P.3d at 867. "At a minimum, personal liability attaches to a defendant who was directly involved in the conduct through conception or authorization." *Id.* at 868. "Other direct involvement, such as active participation or cooperation, specific direction, or sanction of the conduct, also may be sufficient." *Id.*

Whether an individual defendant approved of, directed, actively participated in, or cooperated in the corporation's negligent conduct is usually a question of fact for the jury. *Id.* As explained in *Hoang* :

[A] directed verdict would be proper only if, after viewing the evidence in the light most favorable to plaintiffs and considering every reasonable inference therefrom, reasonable persons could not disagree that the outcome should be for defendant.

*Id.* The division reversed a directed verdict for a manager of a home building company because "the evidence was sufficient to show that defendant approved of, directed, actively participated in, or cooperated in the negligent conduct." *Id.* It relied on the following evidence:

- The manager "knew or should have known the construction techniques implemented did not meet the recommendations by the soils engineer." *Id.* at 869.

- "The soils engineer testified that he told [the manager] about the risks of building in the area, [and] proposed various construction techniques to minimize these risks ...." *Id.*

- The manager "should have known the techniques were not being implemented." *Id.*

- The manager "directly disregarded some of the soils engineer's recommendations." *Id.*

Similarly here, Reeves read all of the soils reports and knew of Terracon's recommendations for structural floors and sump pumps. Yet, he never directed the structural engineer to prepare a "structural foundation plan that would accommodate a structural floor," and he decided not to install a sump pump in any home. When viewed in the light most favorable to plaintiffs, this evidence is sufficient for a jury to determine that Reeves actively participated in, directed, or sanctioned conduct that may have been negligent, and that he knew or should have known plaintiffs' home was constructed negligently.

Accordingly, we conclude that this claim should not have been taken from the jury.

### B. Negligent Misrepresentation

To prevail on their claim for negligent misrepresentation, plaintiffs were required to prove that New Vista supplied false information in a business transaction with them; that it failed to exercise reasonable care or competence in communicating that information; and that they justifiably relied on the false information. *Campbell v. Summit Plaza Assocs.*, 192 P.3d 465, 477 (Colo.App.2008). Such a claim must focus on what New Vista "affirmatively represented, not what it failed to disclose." *Colorado Coffee Bean*, —— P.3d at 31; *see Sheffield Services Co. v. Trowbridge*, 211 P.3d 714, 725 (Colo.App.2009) (whether Colorado law even recognizes a claim of negligent nondisclosure is uncertain).

### 1. Plaintiffs' Evidence

■ Here, most of the homes on lots 1–38 were sold with optional rough-in basement plumbing, and all of them had slab-on-grade basement floors. According to paragraph 13.b.(iii), "Purchaser further acknowledges that any rough-in plumbing or basement windows are provided for service use (such as laundry equipment) and safety only and are not intended to be part of a finished or habitable space, except in the case of a structural basement floor."

Son testified that buying a home with a basement suitable for finishing was important and that when he toured the home before purchasing it, he discussed this consideration with Reeves' stepson, Terry Colvin. Colvin, who was hired by Reeves, worked for the on-site construction superintendent, Champion Construction, in which Reeves held an interest. Colvin responded "this is a perfect basement for finishing." Based on this discussion, son agreed to an upgrade for "rough-in basement bath," at a cost of "$750 to $1000." But he explained that had he known the basement was not suitable as a finished living space without a structural floor, he would not have purchased the home.

■ New Vista provided prospective purchasers with a sales brochure entitled "NEW VISTA HOMES II" that described a "10 Year Structural Warranty" as a "standard feature" of their homes. New Vista also provided purchasers with a "Warranty Coverage Booklet" that explained it would provide coverage in years one and two, and a third-party would provide coverage in years three through ten.

Reeves testified that the actual coverage was not as described in the booklet:

> It is called a 10–year structural warranty. It wasn't 10 years. It was only 8 years' worth of coverage and they call it the 10–year warranty plan.

This discrepancy arose because plaintiffs received a one-year warranty from New Vista, and in their "Home Enrollment Application" they purchased a third-party warranty for years three-ten. However, because they did not understand that coverage in year two also had to be purchased from New Vista separately, they did not do so. In this regard, Reeves testified:

> Q: [D]id they get a 10–year structural coverage as shown in your booklet or not?
>
> A: I don't believe it is as shown in the book.
>
> Q: It is not as shown in the booklet; right?
>
> A: That's correct.
>
> Q: Because you did not provide a warranty to them for year 2?
>
> A: We did not, that's correct.
>
> Q: So they did not get 10 years of coverage; right?
>
> A: I would have to agree with that.

## 2. New Vista

We conclude that this evidence was sufficient for a jury to have decided that New Vista negligently misrepresented the basement bath option, the viability of a finished basement, and the scope of warranty coverage.

## 3. Reeves

Because Reeves never dealt directly with plaintiffs until after the closing on their home, the negligent misrepresentation claim against him presents a closer question. However, "direct communication of the information to the person acting in reliance upon it is not necessary." Restatement (Second) of Torts § 552 comment g (1977).

■ Based on *Hoang*, we conclude that the trial court also erred in directing a verdict for Reeves on this claim. The *Hoang* division allowed the jury to hear a negligent misrepresentation claim against a manager who:

- "[A]pproved of, directed, actively participated in, or cooperated in the representations made to the purchasers." 80 P.3d at 869; and

- "[O]versaw the activities of [the builder's] sales people, ... made decisions regarding the information that was disclosed, and directed them to tell prospective buyers that as long as the homes were properly maintained, their engineering would prevent the risk of expansive soils." *Id.*

Here, plaintiffs presented evidence that Reeves directed the sales activities, held weekly sales meetings, and decided what information would be disclosed. Reeves instructed the architect to include a rough-in basement plumbing option and told the sales agents to inform prospective buyers about this option as a competitive advantage over other developments. Further, he countersigned the UPGRADE WORKSHEET in plaintiffs' purchase agreement showing that they had agreed to pay for "rough-in basement bath," although the home had already been built with a slab-on-grade floor. Thus, a jury could conclude that he put in place the mechanism whereby the basement bath op-

tion was provided to and accepted by plaintiffs, although habitable space was contrary to the engineering analysis of movement inherent in a slab-on-grade basement floor.

Reeves also approved the list of "standard features," including a "10 year structural warranty," in the sales brochure that was provided to potential purchasers, and he read the warranty booklet "in the time frame it was being distributed." We express no opinion on the extent of plaintiffs' resulting damages, if any, because the third-party warranty remains in place.

Accordingly, we conclude that the jury should also have been allowed to consider Reeves' liability for negligent misrepresentation.

## C. Soil Condition Disclosure

Section 6–6.5–101, C.R.S.2010, requires that the builder "supply each buyer with a copy of a publication detailing the problems associated with such soils, the building methods to address these problems during construction, and suggestions for care and maintenance to address such problems." § 6–6.5–101(1); *see Hoang,* 80 P.3d at 870.

■ Here, plaintiffs testified that although they received a copy of the lot specific soils report, they did not receive a copy of the publication described in section 6–6.5–101(1). Because defendants failed to object to this testimony below based on the parol evidence rule, the jury could have considered it, although the agreement recites that the publication was provided. Accordingly, we conclude that the trial court did not err by sending this claim to the jury.

■ Further, we conclude that the trial court did not err by directing a verdict for Reeves on this claim. "[T]his section applies to an individual acting on behalf of a corporate developer ...." *Hoang,* 80 P.3d at 870. But here, plaintiffs failed to present any evidence that Reeves had directed the sales agent not to provide this publication to plaintiffs, and the agent testified that he had provided it to all purchasers.

### D. Implied Warranty

■ The contractual responsibilities of a new home builder "are implicit in the concept [of] 'implied warranty of habitability' " and "include the buyer's right to *both* a home that is built in a workmanlike manner *and* one that is suitable for habitation." *Roper v. Spring Lake Development Co.,* 789 P.2d 483, 485 (Colo.App.1990) (emphasis in original); *see Sloat v. Matheny,* 625 P.2d 1031, 1032 (Colo.1981). Such an implied warranty "has been likened to strict liability for construction defects, and proof of a defect due to improper construction, design, or preparations is sufficient to establish liability in the builder-vendor." *Wall v. Foster Petroleum Corp.,* 791 P.2d 1148, 1150 (Colo.App. 1989).

■ Here, plaintiffs presented evidence that the defects in their home were caused by installing a slab-on-grade basement floor rather than a structural floor and failing to install a sump pump, which might have limited slab movement by dewatering the soil below the slab. This evidence, viewed in a light favorable to plaintiffs, could sustain a jury verdict on breach of the implied warranty of habitability. For the reasons discussed above, we reject New Vista's argument that disclaimers in the purchase agreement precluded the jury from considering an implied warranty claim.

### E. CCPA

Contrary to plaintiffs' assertion, New Vista raised below its contention that "plaintiffs failed to present any meaningful evidence that any other consumers were affected" by the alleged misrepresentations. We agree with this contention and conclude that the trial court should have directed a verdict for New Vista on this claim. Thus, we discern no error in the directed verdict for Reeves on this claim.

■■ To obtain relief under the CCPA, a claimant must prove, inter alia, that an unfair or deceptive trade practice "significantly impact[s] the public as actual or potential consumers." *Hall v. Walter,* 969 P.2d 224, 234 (Colo.1998). Three factors are considered in determining public impact:

(1) [T]he number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 149 (Colo.2003).

■ Here, plaintiffs offered no evidence to establish the requisite public impact. Although 38 of the homes were constructed with slab-on-grade basement floors, this fact does not alone show public impact arising from defendants' alleged misrepresentations concerning soils and flooring. *See Colorado Coffee Bean,* 251 P.3d at 25 (Colorado CCPA cases refer to "the number of consumers directly affected"). Nor does it show how any misrepresentations had previously impacted other customers or would have a significant potential to do so in the future.

Whether slab-on-grade basements in other homes had failed or were likely to fail, and if so in how many, are unproven. Nor does the record show other circumstances surrounding those homes, such as what information was provided verbally to purchasers who chose this basement floor system and whether their purchase agreements were altered. When plaintiffs moved to strike an expert's testimony on comparable home values because all of the homes in the subdivision "have the exact same construction defects," the court denied the motion, explaining:

There is no evidence that these [other] houses have structural defects. There is no evidence that they have cracks. There is no evidence that they weren't built in accordance with their individual soils plans.

Thus, plaintiffs were the only purchasers whom the evidence showed had been directly affected by these misrepresentations. *See Anson v. Trujillo,* 56 P.3d 114, 118 (Colo. App.2002) (no public impact where "plaintiff has not alleged, nor was there evidence, that other consumers were affected by [defendant's] misrepresentation or concealment").

Plaintiffs also presented no evidence concerning the relative bargaining power and sophistication of other purchasers. *See Colorado Coffee Bean,* 251 P.3d at 26 (no public impact where "plaintiffs did not attempt to prove the relative sophistication and bargaining power of the persons who read the Internet posting").

Further, although public impact includes "actual or potential consumers," *Hall,* 969 P.2d at 234, plaintiffs presented no evidence of how many potential purchasers had received the sales brochure with the 10–year structural warranty misrepresentation. Nor did they present evidence of whether any other purchasers ended up with the coverage gap in year two or, if this occurred, whether such purchasers made an informed choice or misunderstood coverage because of inaccuracies in New Vista's documents. *See Rhino Linings USA,* 62 P.3d at 150 (public impact lacking when only a small group of prospective customers is affected, and not the general public).

This case is unlike *Hall,* 969 P.2d at 235, where the supreme court found a public impact because "the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers." Here, plaintiffs did not show that the sales brochure containing the warranty misrepresentation was widely disseminated to the general public. Rather, testimony indicated that the sales brochure was only provided to customers who sought to purchase homes in the subdivision. Nor did they present evidence of "widespread advertising." *Compare Curragh Queensland Mining Ltd. v. Dresser Industries, Inc.,* 55 P.3d 235, 240–41 (Colo.App.2002) (although advertisement was directed to a group of over 3,000, only a handful were potential consumers of seller's product due to the expense of the product), *with Crowe v. Tull,* 126 P.3d 196, 209 (Colo. 2006) (lawyer advertising, via statewide tele-

vision commercials, "potentially affects a large swath of the public").

Accordingly, we conclude that the trial court erred in allowing the jury to consider this claim, and that the damages awarded on it—$33,797.00 each to father and son—must be reversed.[2] Because plaintiffs' claim for appellate attorney fees rests solely on the CCPA, the claim fails.

## II. Actual Damages

■ We next consider and reject New Vista's contention that because estimated repair costs exceeded fair market value of the home, the trial court erred in not capping repair cost damages at fair market value.[3]

Section 13–20–802.5(2), C.R.S.2010, provides in relevant part:

> "Actual damages" means the fair market value of the real property without the alleged construction defect, the replacement cost of the real property, or the reasonable cost to repair the alleged construction defect, *whichever is less ....*

(Emphasis added.) Here, relying on this provision, New Vista argues that the damages must be limited to fair market value, which they assert was indisputably less than plaintiffs' estimated cost to repair the home. But because the record shows that fair market value was disputed, we discern no error in submitting repair costs to the jury.

■ Generally, "[t]he amount of damages is within the sole province of the jury, and an award will not be disturbed unless it is completely unsupported by the record." *Jackson v. Moore,* 883 P.2d 622, 625–26 (Colo.App.1994). "Juries are not required to accept expert testimony, and they may base their award of damages on other evidence in the record." *Harris Group, Inc. v. Robinson,* 209 P.3d 1188, 1202 (Colo.App.2009).

During trial, plaintiffs contested the opinions of two defense experts on fair market

---

2. Based on this conclusion, we need not address plaintiffs' contention that the trial court erred by declining to award prejudgment interest on their CCPA damages.

3. We decline to address New Vista's argument that the CDARA requires costs to be "reason-

able" and therefore prohibits "betterment" such as the repair costs here, because New Vista failed to make this argument before the trial court. *See, e.g., Brown v. Silvern,* 141 P.3d 871, 874 (Colo.App.2005) (arguments may not be raised for the first time on appeal).

value because, among other reasons, one expert merely assumed that the homes he used as comparables did not have similar construction defects, and the other expert conceded that such defects "were never fully explained to him." If the comparables suffered from similar defects, then these experts would have understated the value of a defect-free home. In closing argument, plaintiffs asserted that New Vista had failed to prove fair market value.

Without objection, the jury was instructed:

In determining such Actual Damages, you shall consider the following:

1. Actual damages, which are defined as the lesser of:

a. The fair market value of the real property without the alleged construction defect;

b. The reasonable cost to repair the alleged construction defect . . . .

A special verdict form asked: "Do you find that the fair market value of the real property without the alleged defects has been proven?" The jury responded "No."

New Vista cites no case, nor have we found one, holding that the CDARA requires a plaintiff to present evidence on all three measures of damages. The plain language suggests that any one measure could be appropriate, unless another measure is less.

■ Although New Vista's answer did not specifically raise fair market value as an affirmative defense, the answer pleaded that "Plaintiffs claims may be barred and/or limited by provisions of the [CDARA]." Under C.R.C.P. 8(c), "[a]ny mitigating circumstances to reduce the amount of damage shall be affirmatively pleaded." Thus, like failure to mitigate damages, we conclude that New Vista bore the burden of proving that fair market value was less than plaintiffs' estimate of repair costs. *See, e.g., City of Westminster v. Centric–Jones Constructors,* 100 P.3d 472, 480 (Colo.App.2003); *cf. Andrulis v. Levin Constr. Corp.,* 331 Md. 354, 628 A.2d 197, 208 (1993) ("the burden of proving economic waste is on the party that . . . invokes the doctrine in an effort to limit . . . damages").

■ Because plaintiffs developed a basis for a reasonable jury to reject the experts' opinions and New Vista did not request an instruction that plaintiffs bore the burden of proving fair market value, determining whether the estimated costs to repair the home exceeded its fair market value, without the alleged construction defect, was within the jury's province. *See Harris Group, Inc.,* 209 P.3d at 1202. Further, the record supports the jury's damage award for estimated repair costs.

Accordingly, we conclude that the trial court neither erred by allowing the jury to consider evidence of repair costs nor was it required to set aside the repair cost damages awarded.

### III. Inconvenience Damages

We next address and reject New Vista's contentions that the trial court erred by awarding inconvenience damages to plaintiffs under the CDARA, and that even if the statute allows such damages, the court erred by awarding them to father because he did not live in the home full-time.

### A. CDARA

New Vista does not dispute the testimony of son that movement of the slab basement floor caused him inconvenience. For example, he testified that this home was his "investment" and he wanted to finish the basement; that based on his line of work as a police officer, his home is his "sanctuary," but since discovering the damage, he has been angry and sleepless; and that the stairs to his basement are a hazard and he cannot allow his children to use them.

■ Statutory interpretation involves a question of law that we review de novo. *Smith v. Executive Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010).

When interpreting a statute, we strive to give effect to the legislative purposes by adopting an interpretation that best effectuates those purposes. In order to ascertain the legislative intent, we look first to the plain language of the statute, giving the language its commonly accepted and understood meaning. Where the statutory

language is clear and unambiguous, we do not resort to legislative history or further rules of statutory construction.

*Id.* (citations omitted). Statutes are presumed not to alter the common law unless they do so expressly. *Robinson v. Kerr*, 144 Colo. 48, 52, 355 P.2d 117, 119–20 (1960).

■ As relevant here, the CDARA limits liability of "[a] construction professional [to no] more than actual damages." § 13–20–806(1). "Actual damages" for "personal injury" are defined as "those damages recoverable by law, except as limited by the provisions of section 13–20–806(4)." § 13–20–802.5(2). In turn, section 13–20–806(4)(a) provides:

> In an action asserting *personal injury or bodily injury* as a result of a construction defect in which damages for noneconomic loss or injury or derivative noneconomic loss or injury may be awarded, such damages shall not exceed the sum of two hundred fifty thousand dollars.

(Emphasis added.) This language defeats New Vista's argument that "noneconomic damages do not fall within the scope of allowable 'actual damages'" under the CDARA.

Personal injury damages under the CDARA are subject to section 13–20–806(4)(a), which defines "noneconomic loss or injury" by adopting section 13–21–102.5(2)(b), C.R.S.2010. That section provides:

> "Noneconomic loss or injury" means nonpecuniary harm for which damages are recoverable by the person suffering the direct or primary loss or injury, including pain and suffering, *inconvenience*, emotional stress, and impairment of the quality of life.

(Emphasis added.)

Accordingly, we conclude that the plain language of the CDARA permits recovery of damages for inconvenience, and that the trial court did not err by allowing inconvenience damages to go to the jury.

### B. Father's Inconvenience Damages

■ Father testified that he would "periodically come out to visit" son and stay in the home. During one of these trips, he noticed the cracks in the basement floor. He also testified that the damage to the basement interfered with his use and enjoyment of the home: he had tripped over the unlevel steps leading to the basement; he could not finish the basement; and he could not use a pool table and ping-pong table that he had purchased for use in the basement.

■ In reviewing sufficiency of the evidence, we examine whether the evidence, considered in the light most favorable to the prevailing party, is sufficient to support the jury's verdict. *National Canada Corp. v. Dikeou*, 868 P.2d 1131, 1138 (Colo.App.1993). The jury weighs the evidence, determines the credibility of witnesses, and draws all justifiable inferences of fact from the evidence. *Id.*

New Vista relies on the Restatement (Second) of Torts § 929 comment e, which was cited in *Board of County Commissioners v. Slovek*, 723 P.2d 1309, 1318 (Colo.1986). Comment e explains that damages for discomfort and other bodily and mental harms constitute "distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests." However, comment e also provides that the "owner of land who is not an occupant is not entitled to recover for these harms except as they may have affected the rental value of his land."

Comment e does not say that the term "occupant" means only a full-time resident. The comment could be read as distinguishing between an owner who rents out the property from one who sometimes resides there. And the *Slovek* court left unresolved whether personal injury damages are recoverable by an owner who is not an occupant full-time. *Id.* at 1318 (explaining that the reasoning behind comment e "is not obvious").

■ Absent a contrary agreement between them, each co-owner enjoys a right of occupancy. *See generally Taylor v. Canterbury*, 92 P.3d 961, 964 (Colo.2004). Requiring that a co-owner also be a full-time occupant to recover inconvenience damages would contravene this right by restricting the jury from determining proper inconvenience damages based on, among other factors, the

extent of occupancy. Where this right exists, as here, we discern no reason to preclude a co-owner from receiving inconvenience damages because he exercises the right intermittently.

Accordingly, we conclude that the evidence was sufficient for a jury to determine that father could recover inconvenience damages to the extent that he occupied the house during his trips to Colorado.

## IV. Prejudgment Interest

■ Finally, we reject plaintiffs' contention that the trial court erred by denying prejudgment interest on repair cost damages.

In actions that do not involve personal injury, prejudgment interest is governed by section 5–12–102(1)(b), C.R.S.2010. *See Goodyear Tire & Rubber Co. v. Holmes,* 193 P.3d 821, 825 (Colo.2008). This statute provides in relevant part:

> Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property *after they are wrongfully withheld or after they become due* to the date of payment or to the date judgment is entered, whichever first occurs.

(Emphasis added.)

In *Goodyear,* 193 P.3d at 828, the supreme court interpreted the phrase "wrongfully withheld" in a case involving property damage. The court contrasted diminution of value cases, where the loss is measured as of the time of the injury to the property. It explained:

> When a plaintiff chooses to seek damages in the form of replacement costs incurred at some point subsequent to the wrong, the wrongful withholding occurs when the plaintiff undertakes the replacement expenditure and thus prejudgment interest begins to accrue on that date.

*Id.* at 830. Therefore, a plaintiff's loss is measured "not at the time when the plaintiff suffered injury to his property, but at a later date when the plaintiff spends money to repair or obtain a replacement." *Id.* at 828. This measurement applies because "[b]etween the time of the injury and the time of

incurring replacement costs, the plaintiff retains the use of the money later used to repair or obtain a replacement and therefore can earn a return on it." *Id.*

Here, the trial court denied plaintiffs' request for prejudgment interest on their $405,556 repair cost damages because such interest "would not accrue until ... [the] date of the verdict." We conclude that the court properly applied the *Goodyear* test of whether the plaintiff requests such costs prospectively or retroactively:

> If prospective, the account between the parties closes out as of the date of the verdict. By contrast, in the case of retroactive damages, a plaintiff is made whole as of the date when the costs were incurred.

*Id.* at 827.

We reject plaintiffs' argument that the reasoning of *Goodyear* should be limited to tort claims. The supreme court based its analysis on the type of damages requested, not the type of claim under which those damages were recoverable. And it said that this analysis applies to all "cases involving damage to property." *Id.*

We also reject plaintiffs' argument that their damages were retrospective. As explained in *Goodyear,* plaintiffs did not "undertake[ ] the replacement expenditure" themselves or "spend[ ] money to repair" their home. *Id.* at 828. Thus, we further conclude that their repair costs were prospective in nature and were wrongfully withheld as of the date of the verdict.

Accordingly, we conclude that the trial court did not err by denying plaintiffs' request for prejudgment interest on their repair cost damages.

## V. Conclusion

The judgment in favor of Reeves on plaintiffs' negligence and negligent misrepresentation claims is reversed. The case is remanded with directions to reinstate those claims for retrial as to both damages and liability. The judgment and damages against New Vista on plaintiffs' CCPA claim are reversed. Otherwise, we affirm the trial court's rulings

and the judgment entered on the jury verdict.

Judge MILLER and Judge BOORAS concur.