24CA0614 Smart v Stropas 01-23-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0614
Adams County District Court No. 22CV30289
Honorable Christopher J. Munch, Judge

Samantha Smart and Derek Sweitzer,

Plaintiffs-Appellants,

v.

Stacie A. Stropas, Kenaniah D. Stropas, and Sheree L. Stropas,

Defendants-Appellees.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE SCHOCK
Freyre and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 23, 2025

---

Pat Mellen Law, LLC, Patricia Ann Mellen, Denver, Colorado, for Plaintiffs-Appellants

Stacie A. Stropas, Pro Se

Kenaniah D. Stropas, Pro Se

Sheree L. Stropas, Pro Se

¶ 1 Plaintiffs, Samantha Smart and Derek Sweitzer, appeal the judgment on their claims against defendants, Stacie A. Stropas, Kenaniah D. Stropas, and Sheree L. Stropas. They argue that the district court erred by (1) denying their fraud claim under the economic loss rule; (2) declining to award certain damages; (3) improperly calculating attorney fees and costs; (4) failing to award prejudgment interest; and (5) dismissing their claims against Sheree.[1]

¶ 2 We affirm the judgment with one exception. Because plaintiffs are entitled to prejudgment interest, we remand the case to the district court to correct the judgment to include that award.

## I.    Background

¶ 3 Stacie and Kenaniah, sister and brother, owned a townhome for several years. In April 2021, they listed the home for sale. Days later, plaintiffs made them an offer, which they accepted. The parties entered into a standard form real estate sale contract.

¶ 4 As relevant to this case, the contract contained a "Methamphetamine Disclosure," which provided as follows:

---

[1] Because defendants all share the same last name, we refer to them by their first names, intending no disrespect in doing so.

If Seller knows that methamphetamine was ever manufactured, processed, cooked, disposed of, used or stored at the Property, Seller is required to disclose such fact. No disclosure is required if the Property was remediated in accordance with state standards and other requirements are fulfilled pursuant to § 25-18.5-102, C.R.S.[] Buyer further acknowledges that Buyer has the right to engage a certified hygienist or industrial hygienist to test whether the Property has ever been used as a methamphetamine laboratory. Buyer has the Right to Terminate under § 25.1, upon Seller's receipt of Buyer's written Notice to Terminate, notwithstanding any other provision of this Contract, based on Buyer's test results that indicate the Property has been contaminated with methamphetamine, but has not been remediated to meet the standards established by rules of the State Board of Health promulgated pursuant to § 25-18.5-102, C.R.S. Buyer must promptly give written notice to Seller of the results of the test.

¶ 5    Stacie and Kenaniah also completed and signed a "Seller's Property Disclosure," as required by the contract. The disclosure included a provision that asked if the sellers had knowledge that the property was "previously used as a methamphetamine laboratory and not remediated to state standards." That box was not checked, indicating that the sellers had no such knowledge.

¶ 6    The parties closed on the sale about a month later.  Because Kenaniah was out of state at the time, he appointed his mother, Sheree, as his power of attorney to act for him in completing the sale.  Sheree signed the closing documents on Kenaniah's behalf.

¶ 7    Plaintiffs began renovating the property before moving in.  As they were doing so, neighbors warned them that there may have previously been methamphetamine at the property.  They tested the property and confirmed that the property was contaminated with methamphetamine residue in excess of state regulatory levels.

¶ 8    Unbeknownst to plaintiffs, Stacie had regularly used methamphetamine for approximately a year while she was living in the home, though she claimed to have never brought methamphetamine into the home.  In addition, the father of Stacie's children and her on-and-off boyfriend was a methamphetamine addict and was regularly at the property, though again, Stacie said he did not use methamphetamine in the home.  Stacie and Kenaniah did not disclose any prior methamphetamine use or storage at the property to plaintiffs at the time of the sale.

¶ 9    Upon learning of the methamphetamine contamination, plaintiffs remediated the property.  During the remediation,

plaintiffs rented an apartment in the same complex where they had been living before purchasing the townhome. After several additional rounds of testing, the property was cleared for habitation in December 2021. But despite the successful remediation, plaintiffs never moved into the townhome because they remained concerned that the presence of methamphetamine — though now below state standards — could cause health issues for Sweitzer, who had leukemia. Plaintiffs sold the property in April 2022 for approximately $83,000 more than their purchase price.

¶ 10 Plaintiffs sued defendants for breach of contract and fraud, alleging that defendants were aware of, and failed to disclose, the presence and use of methamphetamine on the property.[2]

¶ 11 The case went to a bench trial, at which defendants represented themselves. After trial, the district court dismissed the claims against Sheree, explaining that it had "heard no evidence that [she] did anything wrong." The court then issued an oral ruling in favor of plaintiffs on their breach of contract claim against

_____

[2] Plaintiffs also asserted a claim for breach of the implied covenant of good faith and fair dealing, but that claim was dismissed before trial and is not at issue in this appeal.

4

Stacie and Kenaniah. It found that the most likely source of the contamination was Stacie's use of methamphetamine while she was living in the home, that Stacie had reason to know of the presence of methamphetamine in the home, and that she and Kenaniah breached the contract by failing to make that disclosure. But the court ruled against plaintiffs on their fraud claim, finding that the parties' relationship arose solely from their contract.

¶ 12    The court orally awarded plaintiffs $71,123 in damages, plus "interest at the statutory rate from the date of closing on the contract." Those damages consisted of (1) $44,720 for the cost of remediation; and (2) $26,403 for the rent and application fee plaintiffs paid for their apartment from the date of the initial testing until the property was cleared for habitation, plus two additional months to account for a notice period for terminating the lease.

¶ 13    The court also awarded plaintiffs reasonable attorney fees and costs under the contract. In doing so, the court explained that if the claim for attorney fees and costs did not exceed forty percent of the damages award, the court would likely find it reasonable. The court said it would not expect fees and costs to exceed that amount.

¶ 14 At the district court's request, plaintiffs submitted a proposed findings and judgment, which tracked the court's oral ruling. They also filed an affidavit for attorney fees and costs, requesting a total of $55,016 — $45,846 in attorney fees and $9,170 in costs.

¶ 15 The district court adopted the proposed findings in part in a written order that also addressed attorney fees and costs. The court said it was "not inclined to find" plaintiffs' request for attorney fees and costs reasonable for what was a "relatively straightforward case against pro se parties." It instead awarded plaintiffs $30,000 and entered judgment "in the amount of $71,123 for proven damages and $30,000 for reasonable attorney[] fees and costs, with interest at the statutory rate from the date of the verdict until paid." The court allowed either party to contest the award of fees and costs by requesting a hearing within twenty-one days. No party did so.

¶ 16 Plaintiffs then filed a C.R.C.P. 59 motion, challenging the denial of their fraud claim, the damages award, and the award of attorney fees and costs. The district court denied the motion.

## II.    Fraud Claim

¶ 17 Plaintiffs first argue that the district court erred by rejecting their fraud claim under the economic loss rule. Relying on *In re*

6

*Estate of Gattis*, 2013 COA 145, ¶ 17, they assert that defendants'
duty to disclose known latent defects in the home was independent
of the parties' contract. Because the contract explicitly addressed
the sellers' obligation to disclose methamphetamine, we disagree.

### A. Economic Loss Rule

¶ 18     The economic loss rule provides that "a party suffering only
economic loss from the breach of an express or implied contractual
duty may not assert a tort claim for such a breach absent an
independent duty of care under tort law." *Town of Alma v. AZCO
Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). The basic purpose of
this rule is to "maintain a distinction between contract law, where
obligations arise from promises made between parties, and tort law,
where obligations arise from duties imposed by law without regard
to any agreement or contract." *Mid-Century Ins. Co. v. HIVE Constr.,
Inc.*, 2023 COA 25, ¶ 26 (*cert. granted in part* Feb. 5, 2024); *see also
BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).

¶ 19     The "essential difference" between a tort claim and a contract
claim is the source of the duty alleged to have been breached.
*BRW*, 99 P.3d at 72. If the duty arises under the provisions of a
contract, the breach must be redressed under contract law, and the

7

economic loss rule applies. *S K Peightal Eng'rs, LTD v. Mid Valley Real Est. Sols. V, LLC*, 2015 CO 7, ¶ 7. If the duty arises independently of any contractual duties, a tort claim will lie. *Id.*

¶ 20 In determining whether a duty is independent of the parties' contract, we consider whether (1) the relief sought in tort is the same as the contractual relief; (2) there is a recognized common law duty of care in tort; and (3) the tort duty differs in any way from the contractual duty. *BRW*, 99 P.3d at 74. If these factors "establish that a duty of care is 'memorialized' in the parties' contract — i.e., the duty is contained within, or imposed under, the contract — it necessarily follows that the plaintiff has failed to show any duty *independent of the contract.*" *City of Aspen v. Burlingame Ranch II Condo. Owners Ass'n*, 2024 CO 46, ¶ 43. Thus, "[e]ven if the duty allegedly breached is separately recognized under tort law, it is not 'independent' of the contract . . . if it addresses the same obligations created by the contract." *Mid-Century Ins. Co.*, ¶ 28.

¶ 21 We review de novo whether the economic loss rule bars a plaintiff's tort claim. *Id.*

## B. Analysis

¶ 22    In *Gattis*, the division held that the economic loss rule did not bar the plaintiff's nondisclosure tort claim for two reasons. First, it concluded that "apart from any contractual obligation, home sellers owe home buyers an independent duty to disclose latent defects of which they are aware." *Gattis*, ¶ 2. Second, that independent duty was not subsumed by the disclosure provisions in the parties' contract in that case. *Id.*; *see also id.* at ¶ 19 (recognizing that "contracts may completely subsume the common law duties").

¶ 23    Accepting *Gattis*'s first holding, it is distinguishable on its second because Stacie and Kenaniah's duty to disclose methamphetamine was explicitly set forth in the parties' contract. In *Gattis*, although the seller's property disclosure referred generally to the defect at issue, the contract "d[id] not set out a standard of care or incorporate one by reference." *Id.* at ¶ 23. Nor did the disclosure form require the sellers to disclose all of the material facts that the court found should have been disclosed. *Id.* at ¶ 24.

¶ 24    In contrast, the parties' contract in this case detailed precisely what the sellers were obligated to disclose concerning methamphetamine — namely, if they knew that methamphetamine

"was ever manufactured, processed, cooked, disposed of, used or stored at the Property." It also made clear when disclosure was *not* required, i.e., "if the Property was remediated in accordance with state standards and other requirements are fulfilled pursuant to [statute]." *Cf. id.* at ¶ 23 (noting that the contract did not "limit[] the parties' rights and liabilities to the categories of information specified in the [disclosure]"). Plaintiffs have not shown how the independent tort duty recognized in *Gattis* "differs in any way from the contractual duty." *BRW*, 99 P.3d 74; *see also Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 2021 COA 143, ¶ 69 (holding that where "concurrent contractual and tort duties not to engage in fraud . . . overlapped," economic loss rule barred tort claim).

¶ 25    Also unlike *Gattis*, the parties' contract included a specific remedy for breach of the methamphetamine disclosure provision:

> Buyer has the Right to Terminate under § 25.1, upon Seller's receipt of Buyer's written Notice to Terminate, notwithstanding any other provision of this Contract, based on Buyer's test results that indicate the Property has been contaminated with methamphetamine, but has not been remediated to meet the standards established by rules of the State Board of Health promulgated pursuant to § 25-18.5-102,

10

C.R.S.  Buyer must promptly give written notice to Seller of the results of the test.

The contract in *Gattis* "provide[d] only general remedies" and prescribed no remedy for nondisclosure.  *Gattis*, ¶ 23.

¶ 26 We note that a division of this court has held that "in most instances the economic loss rule will not bar intentional tort claims."  *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Ctrs.-Centerra LLC*, 2021 COA 2, ¶ 67; *see also Bermel v. BlueRadios, Inc.*, 2019 CO 31, ¶ 20 n.6 ("[T]he economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation.").  But plaintiffs do not argue, beyond *Gattis*, that intentional tort claims *categorically* fall outside the economic loss rule.  So we need not choose a side in the division split on that issue.  *Compare McWhinney*, ¶¶ 73-75, *with Dream Finders*, ¶¶ 63-64; *see also Galvan v. People*, 2020 CO 82, ¶ 45 (noting that appellate courts must "adhere to the party presentation principle, which relies on the parties to frame the issues to be decided").  In any event, even *McWhinney* did not "reject the factors outlined in

*BRW* to determine whether a duty allegedly breached is independent of the parties' contract." *Mid-Century Ins. Co.*, ¶ 40.

¶ 27 Thus, because plaintiffs' fraud claim is based on a duty specifically contained within the relevant contract, that duty is not independent of the contract, and the economic loss rule bars the claim. *See City of Aspen*, ¶ 43. Because we affirm the denial of this claim, we need not address plaintiffs' arguments that they were entitled to noneconomic damages and attorney fees on the claim.

## III. Damages

¶ 28 Plaintiffs next contend that the district court erred by failing to award them certain categories of damages. We disagree.

### A. Standard of Review

¶ 29 The district court has broad discretion to determine the amount of damages in a bench trial. *McDonald's Corp. v. Brentwood Ctr., Ltd.*, 942 P.2d 1308, 1311 (Colo. App. 1997). The proper measure of damages is a question of law that we review de novo. *Kroesen v. Shenandoah Homeowners Ass'n,* 2020 COA 31, ¶ 56. But "the fact finder has the sole prerogative to assess the amount of damages and its award will not be set aside unless it is manifestly and clearly erroneous." *Id.* (citation omitted). A damage

award is clearly erroneous if there is nothing in the record to support it. *Sos v. Roaring Fork Transp. Auth.*, 2017 COA 142, ¶ 49.

¶ 30 The proper measure of damages in a breach of contract action is "the amount it takes to place the plaintiff[s] in the position [they] would have occupied had the breach not occurred." *Acoustic Mktg. Rsch., Inc. v. Technics, LLC*, 198 P.3d 96, 98 (Colo. 2008). The damages must be "traceable to and the direct result" of the breach. *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 529 (Colo. App. 2011) (citation omitted). Damages "need not be calculated with absolute precision" but only to a degree of "reasonable certainty." *Morris v. Belfor USA Grp., Inc.*, 201 P.3d 1253, 1257-58 (Colo. App. 2008).

## B. Additional Two Months' Rent and Utilities

¶ 31 Plaintiffs first argue that the district court should have awarded them their rent and utilities for four months after the remediation was complete instead of two months because they were required to give ninety-one days' notice to terminate their lease.

¶ 32 But as the district court directly addressed at trial, the lease was not introduced as evidence, and there was no evidence of that lease's early termination provisions. *See Tull v. Gundersons, Inc.*, 709 P.2d 940, 947 (Colo. 1985) ("[T]he plaintiff in a breach of

13

contract action bears the burden of proof with respect to damages . . . ."). Indeed, at one point during closing argument, plaintiffs' counsel asserted that, although she did not have a copy of the lease, "[t]ypically it's a 60-day notice of a lease break."

¶ 33    Plaintiffs cite section 13-40-107(2)(a), C.R.S. 2024, for the proposition that a tenancy of one year or longer requires at least ninety-one days' written notice of termination. This statute does not show error for three reasons. First, plaintiffs did not mention it until their C.R.C.P. 59 motion. *See Briargate at Seventeenth Ave. Owners Ass'n v. Nelson*, 2021 COA 78M, ¶ 66 ("Arguments made . . . for the first time in a post-trial motion are too late and, consequently, are deemed waived for purposes of appeal."). Second, plaintiffs point to no evidence in the record that their lease was one year or longer. Third, even if the statute applies to provide a minimum statutory right of termination, nothing prevents a landlord from allowing a tenant to terminate the lease sooner.

¶ 34    Given the evidence in the record, the district court did not clearly err by awarding plaintiffs two months of rent after remediation was complete to allow for termination of the lease.

14

## C.    Closing Fees

¶ 35    Plaintiffs next take issue with the district court's failure to award them their closing costs for purchasing the townhome and selling it after the remediation.  They assert that, if defendants had disclosed the methamphetamine contamination, plaintiffs would not have purchased the property in the first place, and thus would not have incurred the costs of buying and later selling the property.

¶ 36    We conclude that the district court did not clearly err by not awarding these costs as damages.  As the district court explained, and as plaintiffs acknowledge, plaintiffs contracted to receive a home free of methamphetamine contamination.  Under the parties' contract, that meant *either* that (1) methamphetamine had never been on the property; or (2) if it had, the property had been remediated in accordance with state standards.  Once the property was remediated, plaintiffs received what they bargained for.  The closing costs for buying the property were part of that bargain, and the closing costs for selling the property were outside of it.

¶ 37    Moreover, plaintiffs' request to be placed in the position they would have been in if they had not purchased the property is inconsistent with their later sale of the property for a profit.

15

Allowing plaintiffs to keep their profit on the sale of the property while awarding them their closing costs as if they had never purchased (or sold) it would result in a "windfall to plaintiffs, placing them in a better position than they otherwise would have been in absent the breach." *Morris*, 201 P.3d at 1259.

### D. Other Expenses

¶ 38 Plaintiffs also identify four categories of expenses that they attribute to the cost of remediation and claim were not awarded.

¶ 39 We decline plaintiffs' invitation to perform a line-item review of the district court's damages award. *See Morris*, 201 P.3d at 1257-58 (noting that "damages need not be calculated with absolute precision"). The district court found that the cost to clean up the property was $44,720, and it detailed exactly what that amount included — "testing, remediation, replacing the furnace, replacing the carpet, replacing the insulation, replacing the dishwasher, replacing the microwave oven and a $200 delivery charge." The court also explained *why* it drew the line where it did — those charges were incurred "pursuant to the recommendations of the professionals that actually did the clean up of the house." Because

16

the district court's damages calculation is supported by the record, we will not disturb it. *See Tisch v. Tisch*, 2019 COA 41, ¶ 67.

¶ 40     Indeed, two of the items plaintiffs contend were disallowed — the carpet replacement and the attic insulation — *were* included in the damages award. And the court indicated its reasoning for denying others. For example, the court declined to award plaintiffs damages for their own time in remodeling the property because it was not foreseeable that they would perform such work themselves. The court noted that neither expert testified the hardwood had to be removed as part of the remediation. As to the encapsulation painting, plaintiffs' counsel explained in closing that it was done *before* the property was determined to be contaminated, and there was testimony at trial that repainting was not required. These were all factual determinations for the district court. *See Kroesen*, ¶ 56.

## IV.   Attorney Fees and Costs

¶ 41     Plaintiffs assert that the district court erred in its award of attorney fees and costs to plaintiffs. They argue that the district court (1) did not make sufficient findings to allow for meaningful appellate review; (2) failed to analyze their fee request using the lodestar method; and (3) did not award them their reasonable costs.

## A.    Preservation

¶ 42    As an initial matter, we question whether plaintiffs preserved their challenge to the fees and costs award. After plaintiffs submitted their affidavit for attorney fees and costs, requesting approximately $55,000, the district court ruled that it was "not inclined to find this amount to be reasonable" and awarded $30,000 instead. But in doing so, the court explained that "[s]hould either party wish to contest the award of fees and costs, they are entitled to a hearing and may request one by submitting a written pleading within 21 days," in which case "attorney[] fees and costs will be determined after the hearing." Thus, though framed as a judgment, the district court effectively treated its fees and cost award as tentative and invited the parties to object to it if they disputed it. By failing to request a hearing despite the district court's express invitation to do so, plaintiffs seemingly acquiesced in the award. *Cf. In re Marriage of Aldrich*, 945 P.2d 1370, 1380 (Colo. 1997) (holding that party who fails to make a timely request for a hearing on reasonableness of attorney fees and costs waives such a hearing).

¶ 43    But even if plaintiffs preserved their challenge through their initial request for attorney fees and costs or their post-trial motion, we conclude that the district court did not abuse its discretion.

### B.    Standard of Review and Applicable Law

¶ 44    We review an award of attorney fees and costs for an abuse of discretion. *Franklin Credit Mgmt. Corp. v. Galvan*, 2019 COA 107, ¶ 27.  A district court abuses its discretion when it misapplies the law or when its decision is manifestly arbitrary, unreasonable, or unfair.  *Id.*  The district court's determination of a reasonable attorney fee award "will generally not be disturbed on review unless it is patently erroneous and unsupported by the evidence." *Planning Partners Int'l, LLC v. QED, Inc.*, 2013 CO 43, ¶ 12.  The court must make findings "sufficient to allow meaningful appellate review."  *Brody v. Hellman,* 167 P.3d 192, 198 (Colo. App. 2007).

¶ 45    The calculation of reasonable attorney fees generally begins with the lodestar amount, which represents the number of hours reasonably expended on the case multiplied by a reasonable hourly rate.  *S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein*, 2014 COA 171, ¶ 23.  The court may then adjust that amount upward or downward based on several factors,

19

including the degree of success achieved. *Id.* at ¶ 24; *see also*

*Tallitsch v. Child Support Servs., Inc.*, 926 P.2d 143, 147 (Colo. App.

1996) (listing relevant factors). The amount of damages recovered

by the plaintiffs is relevant to whether a fee request should be

reduced based on the degree of success achieved. *Weinstein*, ¶ 25.

C.  Analysis

¶ 46    We first reject plaintiffs' argument that the district court's

findings were not sufficient to allow for appellate review of the

award. Although the findings were not extensive, the district court

identified the factors it relied on to reduce the award: (1) the

"relatively straightforward" nature of the case, including that it was

against pro se parties; (2) the expenditure of significant efforts and

fees against a party who prevailed; and (3) the expenditure of

significant efforts and fees on the unsuccessful fraud claim. *See*

*Tallitsch*, 926 P.2d at 147 (noting that a court may consider "the

complexity of the case" and "the degree of success achieved").

¶ 47    The court also explained in its oral ruling that it would not

expect reasonable attorney fees and costs in a case like this one to

exceed forty percent of the total judgment. *See Payan v. Nash Finch*

*Co.*, 2012 COA 135M, ¶ 53 (rejecting "rule of proportionality" but

holding that court is "not precluded from considering the amount in controversy when awarding attorney fees"); *cf. Weinstein*, ¶ 32 (holding that district court "did not abuse its discretion when it used a ratio of damages actually awarded to damages requested"). Together, these findings are sufficient to give us "a clear understanding of the basis of [the district court's] decision." *Gravina Siding & Windows Co. v. Gravina*, 2022 COA 50, ¶ 79.

¶ 48    We also disagree with plaintiffs that the district court abused its discretion by not calculating the lodestar amount. The court began by acknowledging plaintiffs' request, which was based on the number of hours plaintiffs' counsel billed multiplied by her hourly rate. The court then found that amount was not reasonable — or at least that it was "not inclined to find" that it was — and specifically noted that plaintiffs were not entitled to recover fees for their claims against Sheree and their fraud claim. In doing so, the court effectively applied the lodestar analysis, even if it did not expressly calculate the lodestar amount. *See Weinstein*, ¶ 26 (holding that district court did not abuse its discretion by accepting plaintiff's fee request as the starting point and taking deductions from that amount); *In re Marriage of Collins*, 2023 COA 116M, ¶ 53 (holding

21

that the district court did not abuse its discretion by not calculating a lodestar amount where it considered the lodestar adjustment factors, there was no dispute as to the reasonableness of counsel's hourly rate, and the court's findings were sufficient to support its implied conclusion that the hours expended were reasonable).

¶ 49     The district court certainly could have done more to explain its award of fees and costs.  For example, it would have been better for the court to identify — or at least give examples of — the hours it was excluding and why.  It also would have been better if the court had explained how it landed on $30,000 as the reasonable amount.

¶ 50     But a district court's goal in awarding attorney fees is "to do rough justice, not to achieve auditing perfection . . . tak[ing] into account [the district court's] overall sense" of the case.  *Fox v. Vice,* 563 U.S. 826, 838 (2011).  The court need not do so with the precision of an accountant but "may use estimates in calculating and allocating an attorney's time."  *Id.*  And when it has done so, we must give its determinations "substantial deference" and avoid "appellate micromanagement."  *Id.*  Giving the district court the deference it is due, we cannot conclude that it abused its discretion.

22

¶ 51    Finally, plaintiffs assert that the district court erred by awarding their costs in a "bulk amount" with their attorney fees. But plaintiffs themselves requested their fees and costs as a bulk amount.[3]  They thus invited any error in the district court doing the same.  *See Bernache v. Brown*, 2020 COA 106, ¶ 11 ("The doctrine of invited error prevents a party from complaining on appeal of an error that he or she has invited or injected into the case.").

¶ 52    In any event, the district court awarded plaintiffs their reasonable costs as the prevailing party, as required by rule.  *See* C.R.C.P. 54(d) (allowing consideration of "the needs and complexity of the case and the amount in controversy").  And as noted above, it generally explained the basis of its overall award of fees and costs. *See Danko v. Conyers*, 2018 COA 14, ¶ 72.  Under these circumstances, the district court did not abuse its discretion by combining the cost award with the award of fees, particularly where plaintiffs did the same.  *See id.* at ¶ 68 ("[T]he [district] court's

---

[3] Although plaintiffs' affidavit for attorney fees and costs included separate columns for fees and costs, their ultimate request was for "reasonable fees and costs in the amount of $55,016.43."

findings as to the reasonableness and amount of costs will be disturbed on appeal only for an abuse of discretion.").

## V.  Prejudgment Interest

¶ 53    Plaintiffs next argue that the district court erred by not awarding them their prejudgment interest.  We agree.

¶ 54    In a breach of contract case, the nonbreaching party is entitled to recover prejudgment interest under section 5-12-102(1), C.R.S. 2024.  *Goodyear Tire & Rubber Co. v. Holmes*, 193 P.3d 821, 825-26 (Colo. 2008).  The interest accrues from the date the money has been "wrongfully withheld."  § 5-12-102(1)(a).  In a contract action, that is generally the date of the breach.  *Butler v. Lembeck*, 182 P.3d 1185, 1194 (Colo. App. 2007).  But when the plaintiff seeks damages for replacement or repair costs, prejudgment interest begins to accrue when the plaintiff incurs those costs.  *Goodyear Tire & Rubber Co.*, 193 P.3d at 830; *see also Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1173 (Colo. App. 2010).

¶ 55    The district court appeared to recognize plaintiffs' entitlement to prejudgment interest in its oral ruling, finding that "plaintiffs are entitled to interest at the statutory rate from the date of closing on the contract."  But in its written findings and judgment, the district

24

court awarded plaintiffs interest only "from the date of the verdict until paid" — i.e., postjudgment interest only. Because plaintiffs are entitled to prejudgment interest by statute, this was error.

¶ 56 We therefore reverse the judgment to the extent it fails to award prejudgment interest, and we remand the case to the district court to award plaintiffs prejudgment interest under section 5-12-102(1). To the extent the damages are based on repair costs or other expenditures by plaintiffs, the prejudgment interest should run from the date those costs were incurred. *See Goodyear Tire & Rubber Co.,* 193 P.3d at 830; *Hildebrand,* 252 P.3d at 1173.

## VI. Claims Against Sheree

¶ 57 Plaintiffs' final contention is that the district court erred by ruling against them on their claims against Sheree. We disagree.

¶ 58 Initially, to the extent plaintiffs characterize the district court's ruling as a directed verdict, they are incorrect. The district court's dismissal of the claims against Sheree came at the end of trial, after presentation of evidence and closing arguments. Thus, it was not a directed verdict but a judgment in Sheree's favor on the merits.

¶ 59 We review a judgment after a bench trial as a mixed question of fact and law. *State ex rel. Weiser v. Ctr. for Excellence in Higher*

*Educ., Inc.*, 2023 CO 23, ¶ 33.  We review the district court's factual findings for clear error and its legal conclusions de novo.  *Kroesen*, ¶ 55.  In conducting this review, we defer to the district court's credibility determinations and its assessment of the weight and probative effect of the evidence.  *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 25; *Saturn Sys.*, 252 P.3d at 521.  We will not disturb the district court's factual findings unless they are clearly erroneous and unsupported by the record.  *Amos*, ¶ 25.

¶ 60      The district court correctly ruled against plaintiffs on their claim against Sheree for breach of contract.  Sheree's sole involvement in the sale of the property was as Kenaniah's power of attorney for the closing of the transaction — approximately a month *after* execution of the contract that was allegedly breached.  Even if Sheree had signed *the contract* as Kenaniah's power of attorney, she could not have been liable for a breach of that contract.  *See Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1001 (Colo. 1998) ("If both the existence and identity of the agent's principal are fully disclosed to the other party, the agent does not become a party to any contract which he negotiates.") (citation omitted); *see also* Restatement (Third) of Agency § 6.01 cmt. d (Am. L. Inst. 2006).

¶ 61    But Sheree did not even do that.  She did not receive Kenaniah's power of attorney until two weeks after execution of the contract and property disclosure on which plaintiffs' contract claim is based.  By agreeing to act as Kenaniah's agent for the closing of the transaction, Sheree did not assume his pre-existing contractual obligations.  Thus, because Sheree is not a party to the contract, she could not be liable to plaintiffs for a breach of that contract.

¶ 62    The record also supports the district court's finding in Sheree's favor on plaintiffs' fraud claim.  Sheree's power of attorney to act on Kenaniah's behalf did not make her a seller of the property.  She testified that she did not review the offers, was not involved in the final decision to sell, and never saw the Seller's Property Disclosure.  She further testified that her role as Kenaniah's power of attorney was limited to "sign[ing] the papers on his behalf the day of closing." And although a principal may be liable for an agent's misrepresentations made within the scope of the agency, *see Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 475 (Colo. 1995), an agent generally is not liable for the independent acts of a fully disclosed principal.  *See Hildebrand*, 252 P.3d at 1166 (holding that

agents may be liable for their own acts on behalf of a principal only where they were directly involved in the tortious conduct).

¶ 63 Moreover, even assuming Sheree had a duty to disclose latent defects of which she was aware, the record supports the district court's implicit finding that she did not know of the methamphetamine contamination. Sheree testified that (1) she was unaware of Stacie's methamphetamine usage; (2) Stacie had misled her as to why she was no longer employed; (3) she had only met the father of Stacie's children twice while Stacie owned the property and did not know of his drug problem; and (4) she did not believe Stacie and Kenaniah were responsible for the methamphetamine contamination. To the extent plaintiffs suggest that it is "more likely than not" that Sheree did have such knowledge, that was a question of fact for the district court. *See Amos*, ¶ 25; *Morris*, 201 P.3d at 1258 ("At a bench trial, it is the trial court's duty to assess the evidence and determine the credibility of the witnesses.").

¶ 64 Plaintiffs' argument that Sheree should have been found liable for acting in concert with the other defendants fails for the same reason. Plaintiffs cite section 13-21-111.5(4), C.R.S. 2024, which provides for joint liability for "two or more persons who consciously

28

conspire and deliberately pursue a common plan or design to commit a tortious act." But there can be no joint liability in the absence of an underlying tort. *See Colo. Cmty. Bank v. Hoffman*, 2013 COA 146, ¶ 43 ("Civil conspiracy is a derivative cause of action that is not independently actionable.") (citation omitted); *Resol. Tr. Corp. v. Heiserman*, 898 P.2d 1049, 1055 (Colo. 1995) (concluding that the term "tortious act" in section 13-21-111.5(4) "includes any conduct *other than breach of contract* that constitutes a civil wrong and causes injury or damages") (emphasis added).

¶ 65    Finally, we disagree with plaintiffs that the district court did not make sufficient findings to permit appellate review. The district court found there was no "evidence of any wrongdoing" on the part of Sheree. Implicit in this finding was that Sheree did not breach any contractual duty or knowingly fail to disclose anything she was required to disclose. The court's comments during plaintiffs' closing argument fleshed out this finding, as the court indicated that (1) a person cannot be liable solely for serving as a power of attorney; (2) Sheree's role was limited to signing documents; and (3) there was no evidence Sheree knew her daughter had used

29

methamphetamine in the home. Because these findings have record support, we will not disturb them. *See Amos*, ¶ 25.

¶ 66 Thus, the district court did not clearly err in finding that Sheree was not liable to plaintiffs on their claims.

## VII. Disposition

¶ 67 The case is remanded for the district court to award plaintiffs prejudgment interest. The judgment is otherwise affirmed.

JUDGE FREYRE and JUDGE SULLIVAN concur.