**Marvin L. MARTINEZ and Jorene M. Martinez, Petitioners,**

v.

**AFFORDABLE HOUSING NETWORK, INC.; Senior Entrepreneurs Foundation; E.W. Brossman; Tom Skaggs; Troco, Inc.; and Eldon R. Strong, Respondents.**

**No. 04SC421.**

Supreme Court of Colorado, En Banc.

Dec. 5, 2005.

---

Underhill & Underhill, P.C., Joanne P. Underhill, Dana M. Arvin, Greenwood Village, for Petitioners.

Laff Campbell Tucker Delaney & Gordon, LLP, Darrel L. Campbell, Englewood, for Respondents Troco, Inc. and Eldon R. Strong.

Robert Stuart McCormick, Fort Collins, for Respondent Tom Skaggs.

MARTINEZ, Justice.

In this case we consider whether an interest in the property of homeowners, acquired through a fraudulent scheme, properly passed to purchasers without actual or constructive notice of the fraud. We examine the doctrine of inquiry notice, particularly notice of the rights of persons in exclusive possession of real property and of rights acquired by quitclaim deed. Because we find inquiry notice in the factual circumstances of

this case, we reverse the decision of the court of appeals. *Martinez v. Affordable Hous. Network, Inc.*, 109 P.3d 983 (Colo.App.2005).

## I. Facts and Proceedings Below

In the early fall of 1999, Affordable Housing Network, Inc. (AHN) sent a mail solicitation to Marvin and JoRene Martinez (collectively "Martinez"). The solicitation targeted homeowners who had fallen behind on their mortgage payments and were in need of financial assistance. AHN advertised financial counseling services, assistance with refinancing homes, assistance with avoiding foreclosure, and other similar services. After contacting AHN, Martinez met several times with Tom Skaggs and E.W. Brossman, representatives of AHN. Skaggs and Brossman falsely claimed that AHN was a nonprofit, volunteer organization qualifying under section 501(c)(3) of the Internal Revenue Code. Skaggs and Brossman also falsely represented to Martinez that AHN was part of a HUD-approved program affiliated with Fannie Mae. They offered to help Martinez refinance the home and, if that failed, help Martinez sell the property and purchase a new home with the remaining equity.

Based upon these representations, Martinez entered into an option agreement with AHN on October 2, 1999. Under the agreement, AHN had an option to purchase the property for an option fee equivalent to the amount needed to cure the mortgage deficiency. AHN could purchase the home under certain conditions, including that AHN cure the default within ten days and place the deed into escrow with Rocky Mountain Title.[1] The deed could be removed from escrow only after receiving written instructions from AHN and with proof that the two mortgages had been paid in full or would be satisfied at closing.

On October 7, 1999, Skaggs and Brossman met with Marvin and JoRene Martinez and asked them to sign a quitclaim deed to their home. Skaggs and Brossman told Martinez that the quitclaim deed was for AHN's "protection" should the homeowners abandon the property once AHN cured the mortgage default.

On October 28, 1999, twenty-six days after the option agreement was executed, AHN cured the mortgage deficiency with a payment of $9,020.00 and subsequently put the property up for sale. Among the terms of the option agreement, AHN was to pay the arrears within ten days, declare in writing to the homeowners the intent to exercise the option, and deliver the deed into escrow. Although AHN failed to cure the mortgage default within the specified ten-day limit, Martinez never objected to the late payment.

For the next six months, Martinez cooperated with AHN's efforts to sell the property. Martinez became increasingly dissatisfied with AHN's lack of communication, lack of effort to refinance the home, and failure to show the couple comparable homes for purchase in the event their home sold. Martinez began receiving solicitations to refinance the home and, ultimately, Martinez decided to keep the home, refinance, and reimburse AHN the $9,020.00 for the deficiency.

Martinez testified that on May 2, 2000, a real estate agent telephoned the Martinez home because she wished to bring a potential buyer over to see the property. JoRene Martinez told the agent that she and her husband were no longer interested in selling their home and intended to refinance and pay the money owed to AHN for the deficiency.

The real estate agent "got silent on the phone" and the parties ended the call. The agent then contacted Brossman who in turn phoned JoRene Martinez and insisted that she allow the real estate agent to show the house.

When the real estate agent arrived at the Martinez residence, JoRene Martinez confronted the agent at her doorstep. JoRene Martinez again stated that she did not wish to sell the home and told the agent not to enter the home. The real estate agent ignored JoRene Martinez' protests, pushed her way into the home, and proceeded to show the home to Overton, a Troco, Inc. investor.

---

1. As there is no entity known as "Rocky Mountain Title," the parties stipulate that it is the same entity as "Rocky Mountain Title Services, Inc."

Although Overton arrived with the real estate agent and was "right behind her" as she entered the home, Overton testified that he had no knowledge of JoRene Martinez' statements to the agent or JoRene Martinez' objection to their viewing of the property. Overton also claimed to be unaware of any fraudulent conduct on the part of AHN; however, none of the Troco investors—including Overton—sought any additional assurances from AHN, conducted a title search, or acquired title insurance before purchasing AHN's interest in the property.

Several days after the real estate agent showed the property to Overton, the agent phoned the Martinez home and again spoke with JoRene Martinez. JoRene Martinez insisted that the real estate agent remove the sale sign from the yard and remove the lockbox for the realtor keys from outside the home. The real estate agent went to the Martinez home and removed the sign and lockbox that day.

Within the week, however, the Respondents, Troco, Inc. and Strong (collectively "Troco"), agreed to purchase AHN's interest in the property for $25,000.00. Martinez was not informed of this agreement by AHN, the real estate agent, or Troco. On May 8, 2000, AHN completed and recorded the Martinez quitclaim deed.

Prior to recording the deed, AHN did not place the deed into escrow, did not inform Martinez of any arrangement to sell the property, and did not pay the balance of the two home mortgages or provide any proof that the mortgages would be satisfied at closing.

The next day, on May 9, 2000, AHN quitclaimed the property to Troco. The deed was recorded that same day. The mortgages were not paid.

The parties do not dispute that placing the deed into escrow was part of the agreement between AHN and Martinez. The parties also stipulate that AHN breached the terms of the agreement and AHN did not deliver the deed to Rocky Mountain Title to hold in escrow. Instead, AHN recorded the deed and conveyed its interest to Troco without the knowledge or consent of Martinez.

Troco purchased the home with the understanding that its interest was subject to the balance of the two mortgages totaling $112,646.00. However, the liens on the home were never assigned to AHN or Troco, and Martinez remained personally liable for the balance of the two mortgages. While Troco averred that it intended to pay the balance of the mortgages with the sale of the home, Troco assumed no actual obligation to do so. The profits from the sale to Troco were retained by AHN and distributed in part to Skaggs and the real estate agent. At no point did AHN offer to return the skimmed equity to Martinez.

On May 10, 2000, Martinez received a letter from AHN indicating that the home had been sold to Troco. In a letter dated May 18, 2000, Martinez was informed by Overton that Martinez had the option of repurchasing the home for $150,000.00 or vacating it by June 15, 2000. Martinez then filed suit.[2] Pursuant to a court order, Martinez has remained in the home and has continued to make all mortgage payments on the home. As part of the order, the mortgage payments are said to be the equivalent of rent. Martinez contributes to the equity in the home in exchange for physical occupation of the home and the reduction of Martinez' personal liability on the two mortgages.

At the close of. Martinez' evidence, Troco moved for a directed verdict on the rescission claim. The trial court found that Martinez had abandoned the claim for rescission by failing to restore to AHN the option price that would have put AHN in the position it would have been in but for the contract. The court further reasoned that Troco was a bona fide purchaser entitled to rely upon the deed recorded by AHN. Based on these findings,

---

**2.** Martinez' amended complaint alleged claims of breach of contract, fraud, rescission, unjust enrichment, filing a fraudulent deed in the public record, and violations of the Colorado Organized Crime Control Act, § 18–17–104 to § 18–17–109, C.R.S. (2003), the Uniform Consumer Credit Code, § 5–1–101 to § 5–13–101, C.R.S. (2003) (UCCC), and the Colorado Consumer Protection Act, § 6–1–101 to § 6–1–1001, C.R.S. (2003). The trial court dismissed the UCCC claim on summary judgment motion and the remaining claims proceeded to trial.

the trial court quieted title with Troco and dismissed the Martinez' claims against them. A jury returned verdicts for Martinez and against the other defendants on all of the remaining claims.

Martinez raised a number of issues on appeal, the majority of which were appropriately resolved by the lower courts and will not be disturbed here. We address only those issues raised with respect to Martinez' quiet title claim. In the argument to the appellate court, Martinez asserted that the trial court erred in quieting title with Troco on three grounds: 1) the property should have been returned to Martinez under Colorado's stolen property statute, section 18-4-405, C.R.S. (2003)[3]; 2) the trial court improperly dismissed the Martinez' rescission claim; and 3) the purchasers had notice of Martinez' interests.

The court of appeals found that the stolen property statute was not applicable. The court went on to agree with the trial court that the rescission claim had been abandoned and that the purchasers received good title as bona fide purchasers for value. In reaching this result, the court found that the trial record supported the conclusion that the purchasers paid value, in good faith, and took title without actual or constructive notice of any defect.

We granted certiorari to determine whether the two quitclaim deeds resulted in valid title passing to bona fide purchasers.[4]

## II. Analysis

Martinez argues that the deed to AHN is void because the deed was never delivered into escrow and, consequently, the conditions precedent to the release of the deed from escrow were never satisfied. In response, Troco asserts that Martinez was fraudulently induced to quitclaim the deed to AHN and fraudulent inducement renders the deed merely voidable. Therefore, Troco asserts, it

is protected as a subsequent bona fide purchaser for value, notwithstanding the agreement between Martinez and AHN to hold the deed in escrow.

In Part A, we begin with a review of the determinations made by the courts below with particular focus on the courts' treatment of whether Troco qualifies as a bona fide purchaser. In Part B, we address whether inquiry notice was triggered by the circumstances of this case. In that latter part of our analysis, we look closely at the factual circumstances of the case to determine whether the knowledge of AHN's fraud may be correctly imputed to Troco, thereby defeating Troco's bona fide purchaser status.

### A.

In its order quieting title with Troco, the trial court found that Martinez had abandoned the claim for rescission and that Troco was a bona fide purchaser entitled to rely upon the deed recorded by AHN. The court of appeals affirmed the trial court on both issues.

 In its analysis of the rescission issue, the court of appeals correctly determined that Martinez signed the deed and that material changes to the deed were insufficient to render the deed a forgery. Thus, the deed was not void and the burden was on Martinez to rescind the fraudulently procured deed prior to its conveyance to a subsequent bona fide purchaser. The court correctly determined that Martinez' failure to tender to AHN the $9,020.00 resulted in the abandonment of Martinez' right to rescind. However, because a deed voidable for fraud only protects a subsequent purchaser if the subsequent purchaser took the property for value and without notice of any defect in title, see *Upson v. Goodland State Bank & Trust Co.*, 823 P.2d 704, 705–06 (Colo.1992), the disposition of this case turns upon whether Troco was a bona fide purchaser.

---

**3.** Both the trial court and the court of appeals correctly determined that the stolen property statute does not apply here. Consequently, we did not grant certiorari on this issue.

**4.** The specific issues on which we granted certiorari are: 1) whether the grantee acquired an interest in petitioner's home by a quitclaim deed notwithstanding an agreement to hold the deed in escrow and 2) whether the investors who took the subsequent quitclaim deed to the home from the grantee were bona fide purchasers.

In the quiet title order, the trial court found that Troco was a bona fide purchaser of the property. The court of appeals subsequently affirmed, finding that Troco qualified as a bona fide purchaser because Troco paid value, in good faith, without any notice of defect in title. *Martinez*, 109 P.3d at 988–89. Upon examination of the record, we find no error with the determination that Troco paid value in good faith. A closer examination of whether Troco took the property without notice of a defect in title, however, is warranted.

■■■ We have traditionally recognized three forms of notice: actual notice, constructive notice, and inquiry notice. *Franklin Bank, N.A. v. Bowling*, 74 P.3d 308, 313 (Colo.2003). Actual notice occurs when a party has actual knowledge of a title defect. *Id.* While both "constructive and inquiry notice operate to impute knowledge to a party under certain specific conditions," we recognize them as separate inquiries. *Id.* at 313 n. 11. Constructive notice arises where a search of the title records would have revealed a defect. *See id.* at 313. "Inquiry notice arises when a party becomes aware or should have become aware of certain facts which, if investigated, would reveal the claim of another." *Id.* However, notice will not be "imputed to a purchaser if a reasonable search would prove, or would have proven, futile." *Littlefield v. Bamberger*, 32 P.3d 615, 619 (Colo.App.2001).

From the record below, it is clear that Troco did not have actual notice of a defect in title. It is also clear that constructive knowledge of a defect in title cannot be imputed from the record title at the time of Troco's purchase. The record title would have revealed that title was recorded in Martinez' name, but it would not have revealed a defect in the then unrecorded quitclaim deed held by AHN, or the underlying fraud used to procure said deed.

The trial court addressed inquiry notice only briefly during the court's oral order at trial:

This claim against them is really on the weakest thread, which is—is that at the time they went over to the house and Ms. Martinez expressed some regret about showing the house or about wanting to go through with it, that this should have put them on notice .... The law is not intended to ask bona fide purchasers to inquire into whether or not a manifestation of some outward response is ... buyer's remorse.

At this stage of the trial, the court properly considered the facts in the light most favorable to Martinez by assuming that Troco had knowledge of the conversation between the real estate agent and JoRene Martinez. The court then found that this knowledge was not enough to give rise to a duty of inquiry.

The court of appeals largely adopted the trial court's conclusion that inquiry notice had not been triggered. *Martinez*, 109 P.3d at 988–89. The court of appeals further held that even if a reasonable inquiry had been conducted, it "would have shown that AHN possessed legitimate title pursuant to the terms of an executed option agreement and that [Martinez'] possession of the property was in accordance with this agreement." *Id.* at 989.

Both the trial court and the court of appeals concluded that even if an appropriate inquiry were conducted, such an inquiry would have led to the discovery of the option agreement, but would not have revealed the fraud of the underlying transaction. In its suggestion that an inquiry would have merely revealed "buyer's remorse," the trial court implicitly acknowledged the sales arrangement that was embodied in the option agreement. The court of appeals explicitly recognized that an inquiry would have led to the option agreement:

[T]he evidence at trial indicates that a reasonable investigation would not have revealed the fraud perpetrated by AHN. Instead, a reasonable inquiry would have shown that AHN possessed legitimate title pursuant to the terms of an executed option agreement and that [Martinez'] possession of the property was in accordance with this agreement.

*Id.*

We do not find any error with the analysis of the lower courts recognizing that the option agreement would have been discovered

upon reasonable inquiry. However, for reasons discussed below, we reject the conclusion of the lower courts that the facts of this case did not require reasonable inquiry that would have revealed the underlying fraud.

## B.

Because the court of appeals determined that an inquiry would not have revealed that the deed was voidable due to the underlying fraud, the court never fully addressed whether inquiry notice was triggered by the circumstances of this case. Mindful of the procedural posture of this case, we now examine the evidence presented at trial to resolve this issue before returning to the conclusion of the lower courts that a reasonable inquiry would have been futile.

■■■ Inquiry notice imputes knowledge where the circumstances are such that they would have aroused the suspicions of an ordinary purchaser. *See Littlefield,* 32 P.3d at 618–19. And, once there is a duty to inquire, the purchaser "will be charged with all knowledge that a reasonable investigation would have revealed." *Franklin Bank, N.A.,* 74 P.3d at 313; *see also Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 919 (Colo. App.1991).

■■■ It is well settled in Colorado that, with certain exceptions inapplicable here, possession of real estate is sufficient to put an interested person on inquiry notice of any legal or equitable claim the person or persons in open, notorious, and exclusive possession of the property may have. *See Hitchens v. Milner Land, Coal & Townsite Co.,* 65 Colo. 597, 601, 178 P. 575, 576 (1919); *Colburn v. Gilcrest,* 60 Colo. 92, 94, 151 P. 909, 910 (1915); *Yates v. Hurd,* 8 Colo. 343, 344, 8 P. 575, 576 (1885); *Tiger v. Anderson,* 976 P.2d 308, 310 (Colo.App.1998).

This court has found that the rule applies where "the party having and alleging possession is the plaintiff in a suit to reform an instrument which purports to vest title to the land, so possessed, in another." *Hitchens,* 65 Colo. at 601, 178 P. at 577. Further, where the party in possession is the sole tenant and lessee, certain circumstances may give rise to a duty to inquire as to their rights as tenants beyond mere possessory rights. *See Cohen v. Thomas & Son Transfer Line, Inc.,* 196 Colo. 386, 388, 586 P.2d 39, 41 (1978).

In *Cohen,* we rejected the assertion that a prospective purchaser with constructive notice of the lessee's tenancy has only the limited duty to inquire about the possessory rights of the tenant. *Id.* The party in possession of the property in *Cohen* was the lessee of a commercial property which had been conveyed from the lessor/grantor to a third-party grantee. *Id.* at 387, 586 P.2d at 40. The lessee sought specific performance of a right of first refusal contained in the lease. *Id.* The lease was never recorded, and the lease term had actually expired at the time of the sale. *Id.* Although the purchasers were aware of the existence of the expired lease, they never asked to see the lease, nor did they question the lessee. *Cohen,* 196 Colo. at 387–88, 586 P.2d at 40. Under those circumstances, we concluded that a "reasonable inquiry would have included inquiry of the lessee who was the sole tenant in possession." *Id.* at 388, 586 P.2d at 41.

The present case is not dissimilar on the facts. Troco was aware that Martinez was in physical possession of the property. Troco also had a duty to inquire as to Martinez' rights as a lessee, and is deemed to have constructive notice of those rights. *Id.* at 388, 586 P.2d at 40. *See also Cook v. Hargis,* 164 Colo. 368, 376, 435 P.2d 385, 390 (1967). Here, the lease agreement was contained within the option agreement. Thus, Troco was on inquiry notice of Martinez' rights as contained in the option agreement. As in *Cohen,* the lessee had both tenancy and possessory rights contained in an agreement of which the purchaser had inquiry notice. Consequently, Troco had a duty under the circumstances to inquire as to both the Martinez' possessory and tenancy rights.

In determining that the circumstances of this transaction were sufficient to put Troco on inquiry notice, we also consider that these conveyances were made by quitclaim deeds.

Colorado has rejected the now disfavored notion that a quitclaim deed is enough, in itself, to put a purchaser on notice of a defect

in title. *Franklin Bank, N.A.*, 74 P.3d at 313 n. 12. Although it is true that a quitclaim deed does not convey title but only that interest that the grantor has to convey, we do not find this limitation so unusual that a purchaser should, on this basis alone, be wary of the validity of this type of conveyance. However, while a conveyance by quitclaim should not automatically raise suspicion, it should not shield a transaction from scrutiny either. When a grantor chooses to convey property by quitclaim, an element of risk is imposed upon the buyer that would not otherwise be present if the conveyance were by warranty deed. Thus, although by no means dispositive, a conveyance by quitclaim is a significant factor to be considered when assessing inquiry notice. *See id.*

Here, there were two back-to-back quitclaim conveyances. Troco purchased the second quitclaim deed from AHN without conducting a title search or making any further inquiry into the transaction. Troco also purchased the property fully aware that the Martinez' two recorded mortgages had not been satisfied. It does not appear that Troco made any inquiry as to why the property remained subject to these liens. From the buyer's standpoint, this is an unusual transaction to simply accept at face value.

Pursuant to two back-to-back quitclaim conveyances—neither of which satisfied the attendant mortgages prior to sale—Troco purchased the property from AHN fully aware that Martinez was in physical possession of the property. We find that an ordinary purchaser in Troco's position would have been suspicious of the circumstances surrounding this transaction and should have inquired further. A reasonable inquiry would have included both an inquiry into Martinez' tenancy rights as well as into Martinez' possessory rights. Moreover, a reasonable inquiry into the tenant's rights in this case would have led, without further inquiry, to the possessory interests precisely because the lease was contained in the fraudulent option agreement.

Although it was not necessary for the trial court to resolve the issue of whether Troco was aware of the conversation between JoRene Martinez and the real estate agent in a mid-trial order, it is a circumstance relevant to inquiry notice. If Overton was aware of JoRene Martinez' statements to the real estate agent (i.e., her statements that they did not wish to sell *their* home, planned to repay AHN, and remain in the home), her statements would have put Troco on notice that there was a potential problem with the quitclaim conveyance to AHN. JoRene Martinez' statements, described by the trial court as "buyer's remorse," indicated a conflict in the ownership of the property.

Contrary to the trial court's legal conclusion, it is not too much to ask that a buyer make further inquiries when made aware that the person in physical possession of the property believes they are in fact the true owner of the property. When a reasonable person is made aware that someone in physical possession of property claims ownership, the prudent course of action is to make further investigations.

Whether Troco was aware of JoRene Martinez' statements is a relatively minor consideration in our analysis of inquiry notice in this case. That Troco knew Martinez was living in the home, especially when considered together with the quitclaim deeds and unsatisfied mortgages, created a duty on the part of Troco to inquire further.

As noted in Part A and in our discussion of tenancy rights, a reasonable inquiry would have led to the option agreement between Martinez and AHN. The lower courts concluded that the discovery of the option agreement would not have revealed the underlying fraud. *Martinez*, 109 P.3d at 989. However, upon review of the agreement, we find this conclusion in error.

By its express terms, the option agreement would have plainly revealed that AHN had not purchased the quitclaim deed according to the option terms. This conclusion may be drawn from Troco's averment that they took the quitclaim deed subject to the mortgages, in conjunction with the plain language of the option agreement that required that the two mortgages be satisfied as a condition precedent to the release of the deed from escrow. Given that Martinez remained liable on the mortgages and the property remained subject to the liens when Troco purchased the property, it would have been apparent that

the conditions of the contract were breached by AHN.

In sum, a reasonable investigation would have revealed the option agreement and the underlying fraud. Hence, because Troco had a duty to inquire, we impute the knowledge of the contract breach and resultant defect in delivery of the deed to Troco. Therefore, Troco is not protected as against Martinez' claim, because Troco was on inquiry notice that the deed was fraudulently procured.

### III. Conclusion

We conclude that the trial court erred when it found at mid-trial that Troco was a bona fide purchaser without notice. Accordingly, we reverse the decision of the court of appeals affirming the trial court's quiet title order. We remand for further proceedings consistent with this opinion.