24CA0585 MG Dyess v MarkWest 05-22-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0585
City and County of Denver District Court No. 18CV34745
Honorable Andrew J. Luxen, Judge

M.G. Dyess, Inc., a Mississippi corporation,

Plaintiff-Appellee,

v.

MarkWest Liberty Midstream & Resources, L.L.C., a Delaware limited liability corporation,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Gomez and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

Wheeler Trigg O'Donnell LLP, Meghan Frei Berglind, Denver, Colorado; Kilpatrick Townsend & Stockton LLP, Adam H. Charnes, Dallas, Texas; Kilpatrick Townsend & Stockton LLP, R. Lee Mann III, Atlanta, Georgia, for Plaintiff-Appellee

Snell & Wilmer L.L.P., James D. Kilroy, Ellie Lockwood, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1 In this construction contract dispute, defendant, MarkWest Liberty Midstream & Resources, L.L.C. (MarkWest), appeals the remand court's order setting the amount of quantum meruit damages awarded to plaintiff, M.G. Dyess, Inc. (Dyess), at $31,702,197.14 and denying MarkWest's motion for a new trial. We affirm the district court's judgment.

I. Background

¶ 2 MarkWest, a corporation that processes and transports natural gas, entered into three contracts with Dyess, a pipeline construction company, to install thousands of feet of pipeline. Each contract concerned a particular length of pipeline, called a "spread," and each spread was assigned a lump sum payment amount and a "mechanical completion date" after which liquidated damages would accrue if the spread remained incomplete.

¶ 3 According to Dyess, MarkWest materially hindered its work, increasing the costs and duration of the project. Dyess sued MarkWest, asserting claims for breach of contract, negligent misrepresentation, fraudulent nondisclosure, fraud, promissory estoppel, and quantum meruit. MarkWest countered that it had not hindered Dyess's work and that Dyess had failed to achieve

1

mechanical completion by the contractual deadlines. MarkWest counterclaimed for liquidated damages under the three operative contracts. Both parties demanded a jury trial, and the multi-day trial began February 3, 2020.

¶ 4    MarkWest maintained that Dyess's promissory estoppel and quantum meruit claims were not triable to the jury because they were equitable claims. Dyess argued that these claims were legal and that MarkWest had waived any objection to a jury trial.

¶ 5    Concluding that Dyess had brought "a mix of legal and equitable claims," the trial court submitted all the claims to the jury under C.R.C.P. 39(c), which allows courts to "try any issue with an advisory jury" in "all actions not triable by a jury." The court also noted that, if the jury awarded relief on an "arguably equitable claim," the court could allow further briefing.

¶ 6    The jury rejected Dyess's claims, except its quantum meruit claim, and awarded $26,039,641 in damages. It also awarded MarkWest $4,500,000 in liquidated damages for its counterclaim. MarkWest immediately moved to treat the jury's quantum meruit verdict as advisory, asking the court to decide the issue.

¶ 7     MarkWest urged the court to conclude that MarkWest was not liable to Dyess for the quantum meruit claim, and in the alternative, that Dyess could only recover $934,436, the approximate amount for the items listed in Jury Instruction 60 — outlining the elements for a quantum meruit recovery.  Dyess countered that its expert had testified to overall losses equal to or greater than the amount awarded, so the $26,039,641 verdict had evidentiary support.

¶ 8     As relevant here, the trial court concluded that quantum meruit is "an equitable theory of recovery . . . triable by the court and not by a jury, subject to the right of the court to impanel an advisory jury under C.R.C.P. 39(c)."  It accepted the jury's "advisory verdict" — finding that MarkWest was liable under a quantum meruit theory — but reduced the damages to $934,436.[1]

¶ 9     Dyess next asked for a judgment notwithstanding the verdict (JNOV) on MarkWest's counterclaim, asserting that it had achieved mechanical completion before the final mechanical completion dates, which it claimed MarkWest had extended.  The trial court did

---

[1] Dyess submitted six invoices — totaling $934,436 — that MarkWest failed to pay.

not rule on the motion, and it was therefore deemed denied by rule.[2]  *See* C.R.C.P. 59(j).

¶ 10    Dyess appealed (1) the order treating the verdict in its favor as advisory and reducing the damages award; (2) the denial of its motion for JNOV on MarkWest's counterclaim; and (3) the denial of its motion for pre- and post-judgment interest.  MarkWest cross-appealed the denial of its motion for pre- and post-judgment interest.

¶ 11    A division of this court reversed the judgment insofar as the trial court (1) "reduced the amount of damages awarded to Dyess on its quantum meruit claim" and (2) "failed to award pre- and post-judgment interest."  *M.G. Dyess, Inc. v. MarkWest Liberty Midstream & Res., L.L.C.*, 2022 COA 108, ¶ 38.  It affirmed the judgment insofar as the trial court accepted the jury's liability verdict on the quantum meruit claim and denied Dyess's motion for JNOV.  *Id.* at ¶¶ 23, 34.  The case was then remanded for further proceedings. *Id.* at ¶ 38.

---

[2] Both parties filed C.R.C.P. 59(c)(4) motions to amend the judgment to include pre- and post-judgment interest.  These motions were also deemed denied.  *See* C.R.C.P. 59(j).

¶ 12    On remand, the court recognized that the court of appeals had affirmed the finding of liability on quantum meruit damages in favor of Dyess.  Because the jury had awarded $26,039,641 in favor of Dyess (on quantum meruit) and $4,500,000 in favor of MarkWest (on its contract counterclaim), the remand court subtracted the latter from the former to arrive at a judgment of $21,539,641 in favor of Dyess.  The court then added prejudgment interest of $2,712,319.08 (eight percent, compounded annually) and postjudgment interest of $7,450,237.06, for a total judgment of $31,702,197.14.

¶ 13    As expected, MarkWest asked for a new trial and Dyess opposed that request.  MarkWest continued to argue that, unless Dyess agreed to a reduced judgment of $934,436, the court should grant a new trial because the jury's damage award was manifestly

excessive and unsupported by the evidence.[3] MarkWest's theory at trial, and on remand, was that any excess charges by Dyess were subject to the contract's change order process.

¶ 14    Dyess countered that the jury heard ample evidence that MarkWest directed Dyess to perform out-of-scope work, work which benefited MarkWest and for which Dyess was not paid. Moreover, Dyess refuted MarkWest's suggestion that Jury Instruction 60 limited (to $934,436) the recoverable out-of-scope work expenses.

¶ 15    Indicating that it had reviewed the record, the remand court (with a new judge presiding after the trial judge retired) concluded that the jury's damages award was not "manifestly excessive" given the evidence presented and denied MarkWest's request for a new trial. *See Murphy v. Glenn*, 964 P.2d 581, 586 (Colo. App. 1998) (successor judge has discretion to rule on post-trial motion

---

[3] Liability for quantum meruit was affirmed by the prior division of this court, so it is not at issue here. *See M.G. Dyess, Inc. v. MarkWest Liberty Midstream & Res., L.L.C.*, 2022 COA 108, ¶ 38. To the extent MarkWest argues for a new trial on anything other than the amount of damages, we will not entertain that argument. *See Saint John's Church in Wilderness v. Scott*, 2012 COA 72, ¶ 8 ("The law of the case doctrine protects parties from relitigating settled issues, on the grounds that courts generally 'refuse to reopen what has been decided.'" (quoting *People ex rel. Gallagher v. Dist. Ct.*, 666 P.2d 550, 553 (Colo. 1983))).

challenging the sufficiency of the evidence). The court also acknowledged that Dyess did not agree to a remittitur.

¶ 16 MarkWest now appeals the remand court's orders. *See Simpson v. Yale Invs., Inc.*, 886 P.2d 689, 699 (Colo. 1994) ("When a case is remanded to the trial court and subsequently appealed, the reviewing court will consider only those issues arising after the remand and whether the trial court complied with the order of remand.").

## II. Applicable Law

### A. Standards of Review

¶ 17 "We review a trial court's order for a new trial for an abuse of discretion. A trial court abuses its discretion when its ruling is 'manifestly arbitrary, unreasonable, or unfair,' or when it misapplies the law." *Rains v. Barber*, 2018 CO 61, ¶ 8 (citations omitted).

¶ 18 In determining whether a party may recover for unjust enrichment, we "defer to the trial court's factual findings unless they are clearly erroneous." *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24. However, we review de novo contentions that an express contract bars an unjust enrichment claim. *See Interbank*

*Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).

### B. Grounds for a New Trial Under Rule 59(d)

¶ 19 Rule 59 governs motions for new trials. C.R.C.P. 59(a)(1). Rule 59(d) lists six distinct grounds for a new trial:

> (1) Any irregularity in the proceedings by which any party was prevented from having a fair trial; (2) Misconduct of the jury; (3) Accident or surprise, which ordinary prudence could not have guarded against; (4) Newly discovered evidence, material for the party making the application which that party could not, with reasonable diligence, have discovered and produced at the trial; (5) Excessive or inadequate damages; or (6) Error in law.

*Rains*, ¶ 11 (quoting C.R.C.P. 59(d)(1)-(6)). The following principles guide our review of whether the remand court abused its considerable discretion, *see Averyt v. Wal-Mart Stores, Inc.*, 265 P.3d 456, 462 (Colo. 2011), in denying a new trial for the jury's allegedly excessive damage award:

- The amount of damages is within the jury's sole province, and an award will not be disturbed unless it has no record support. *Id.*; *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1170 (Colo. App. 2010).

8

- The verdict's excessive nature must clearly and definitely indicate that the jury (1) ignored the court's instructions and the undisputed evidence; or (2) was swayed by prejudice, passion, or another improper consideration. *Martinez v. Affordable Hous. Network, Inc.*, 109 P.3d 983, 992 (Colo. App. 2004), *rev'd on other grounds*, 123 P.3d 1201 (Colo. 2005); *see also Averyt*, 265 P.3d at 462-63 (an award may be adjusted where there is an indication that the "jury acted out of passion, prejudice, or corruption").

### C. Legal Principles of Quantum Meruit

¶ 20 A party asserting an unjust enrichment claim must prove "that (1) at the plaintiff's expense (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Bd. of Governors of Colo. State Univ. v. Alderman*, 2025 CO 9, ¶ 35. However, a party typically cannot assert an unjust enrichment claim "if a valid contract covers the same subject matter." *Id.* at ¶ 36. Colorado appellate courts recognize two exceptions to this rule: "(1) the express contract fails or is rescinded or (2) the claim covers matters that are outside of or arose after the contract." *Id.* at ¶ 37; *accord*

*M.G. Dyess*, ¶ 17; *Specialized Grading Enters., Inc. v. Goodland Constr., Inc.*, 181 P.3d 352, 354-55 (Colo. App. 2007).

## III.   Analysis

¶ 21     While the remand court did not fully explain what evidence supported the jury's damages award, it indicated that its review of the evidence supported that award, and it identified the legal authority upon which it relied in declining to reduce the jury's award or grant a new trial on damages.  Without the benefit of a detailed analysis to review, we rely on the record, as outlined below, for our analysis.  *See Interbank Invs.*, 77 P.3d at 816 (reviewing de novo whether an express contract bars an unjust enrichment claim).

## A.   Additional Background

¶ 22     Dyess and MarkWest's operative contracts for the subject pipelines were effective in August 2017.  The contracts contemplated that the first spread (spread 1A, .32 miles) and the third spread (spread 2, 6.18 miles) would be completed by January 15, 2018, and the second spread (spread 1B, 7.52 miles) by October 1, 2017.  The parties agree that the deadline for the first and third spreads was extended once, but they dispute whether MarkWest

granted additional extensions.[4]  *M.G. Dyess*, ¶ 31 n.4.  In any event, each party blames the other for work delays and associated expenses.

¶ 23     According to Dyess, its inability to construct the pipelines in tandem, as its bid documents indicated, and on schedule resulted from MarkWest's delayed property access, inspector limits, weather stoppages, and repeated safety shutdowns.  So it had to expend substantially more in labor and materials to meet its obligations to MarkWest.

¶ 24     MarkWest argues here, as it argued to the remand court, that (1) the express contracts precluded Dyess from recovering for unjust enrichment, and (2) the jury could only award quantum meruit damages for the work identified in Jury Instruction 60 (or $934,436).  Dyess disagrees that its quantum meruit damages are limited in either way.

---

[4] There was conflicting testimony about whether MarkWest extended the completion dates for one or more of the spreads. Ultimately, the prior division of this court indicated that the jury could have reasonably inferred that any extension was conditional on successful completion of the parties' (ultimately unsuccessful) attempts to negotiate the matter.  *M.G. Dyess*, ¶¶ 28-34. Consistent with this finding, the division did not disturb the jury's $4,500,000 award in MarkWest's favor.  *Id.*

¶ 25    Before turning to the delays and expenses Dyess detailed to the jury, and MarkWest's rebuttal to those, we provide an overview of the key contract provisions.

### B.    Contract Provisions Invoked

¶ 26    Section 1.1 of each contract required that Dyess perform "all workmanship, labor, materials, and equipment set forth in Exhibit 'A' [the Scope of Work], and as subsequently added by [MarkWest] in accordance with the terms of th[e] Contract." Section 4 detailed that

> Changes to the Scope of Work (for work in addition to that covered under the Lump Sum Fixed Price . . . and which is consistent with the original terms and intent of this Contract) shall be made only by a written change order specifying the requested changes or additions, including changes to the Lump Sum Fixed Price.

¶ 27    MarkWest reiterates that the scope of work was broad and covered installing the specified lengths of pipe for each spread. It also points to the following provisions as limiting Dyess's recovery:

- Sections 2.17 and 3.1, requiring that any extra work be authorized through approved change orders; and

12

- Section 4.7, identifying the approving authorities for change orders.

¶ 28    As relevant to Dyess's position, Section 3.18 provides that changes that increase or decrease the scope of work will be handled via a negotiated adjustment, and Dyess tried to negotiate for time extensions and additional payments.[5] When a settlement proved elusive, Dyess sued to recover the labor and materials it provided, and MarkWest countered by demanding contractual delay damages.

### C.    Access Issues

¶ 29    During the bid process, MarkWest representatives disclosed that they had not secured all necessary legal land access but indicated the access would soon be resolved and certainly before Dyess planned to begin the pipeline work. The access required to complete spread 1B was belatedly secured near the end of September 2017.

---

[5] During trial, MarkWest claimed that, in extending the pipeline completion deadlines, it effectively compensated Dyess for any expenses incurred before the end of December 2017. The jury agreed that (even with the extension) Dyess did not timely complete the pipeline segments (as the delay payments verdict reflects), but it seemingly rejected MarkWest's claim that Dyess contractually waived any claim to overages.

## D.    Inspector Delays

¶ 30    After the contracts were signed, Dyess learned that most of its ground disturbance activities needed to be inspected by a MarkWest-provided inspector.  Dyess's original work plan called for nine or ten work crews working simultaneously to expedite pipeline progress.  With only two inspectors, Dyess could only mobilize two crews.  And coordinating the two inspectors' presence on site proved difficult.  MarkWest disputes any surprise, but Dyess was not the only contractor requesting more inspectors.

¶ 31    Although Brian McRaney, Dyess's project manager, asked for additional inspectors so Dyess could deploy more work crews, he did not receive more inspectors until mid-December, well after spread 1B was due (October 1, 2017) and shortly before the other two spreads were to be delivered (January 15, 2018).[6]  As it turned out, the additional three inspectors (five in total) did not provide the

---

[6] Michael Hoy, MarkWest's construction manager, acknowledged that because Dyess did not have access to the land for spread 1B until September 25 or 26, 2017, it was unrealistic for MarkWest to expect Dyess to construct 7.52 miles of pipeline in a few days, or by the October 1, 2017, due date in the contract.

relief Dyess needed because a December 2017 MarkWest incident on a different spread further delayed Dyess's work.

### E. Weather Delays, Fatality, and "No Slip" Policy

¶ 32     The fall of 2017 was a wet season in the area where the pipeline was being installed. In addition to the challenges the rain and snow posed to the pipeline workers, there was a fatality on spread 4 (Dyess was not working on that segment) caused by heavy equipment sliding into a worker and crushing him against another piece of equipment. That fatality lead MarkWest to implement its "no slip" (or heavy equipment) policy. Dyess agreed to abide by MarkWest's no slip policy, which did not allow pipeline contractors to work when weather conditions limited workers' ability to safely manage heavy equipment or otherwise endangered pipeline crewmembers.

¶ 33     Dyess lost workdays because of this policy and soon realized it would not meet the January 2018 spread deadlines. MarkWest extended the due dates into March 2018, but Dyess continued to work into July 2018 even though it was unsuccessful in negotiating another extension.

15

## F.    Claimed Harm

¶ 34    The remand court was largely tasked with determining whether the jury's $26,039,641 quantum meruit award enjoyed record support.  Without the benefit of the remand court's analysis, we must look at the evidence in the record to determine whether the record supports the award.

¶ 35    Dyess presented expert testimony from Jens Baker detailing the additional expense Dyess incurred as the project continued.  Baker explained the components of the figures he provided for the jury to consider as follows[7]:

---

[7] The jury also heard that Dyess incurred $67,004,011 in added expenses.  But MarkWest had paid $40,964,370 of Dyess's billings, so the difference — without any expected profit — was $26,039,641.  This testimony likely explains how the jury arrived at its damages award.  According to Baker, the jury should have awarded $28,303,383 (without the 23.3% contractual markup) or $34,205,285 (with the markup).  To the extent Baker looked to the contract to add a markup to cover home-office and other such costs, that markup came from the contract itself.  As the jury did not award breach of contract damages to Dyess, it would have been inappropriate to award Dyess any amount for markups.  Baker's calculations also relied, in part, on the fee schedules Dyess supplied to MarkWest (but MarkWest provided no alternative fee structure for the jury to consider).  Baker also testified that he updated change order 8 using the negotiated rates in the contacts, agreeing that those rates included a markup.

| Costs (*indicates 23.3% markup applied) | Amount |
|---|---|
| Extended Performance Costs Due to MarkWest Interferences* | $9,782,152 |
| Move-Arounds Caused by Right-of-Way Restrictions | $169,326 |
| Schedule Revisions and Crew Changes Directed by MarkWest* | $6,607,568 |
| MarkWest Failure to Supply Operations Personnel (after 12/7/17 and before 12/16/17) | $1,946,584 |
| Shutdowns (directed by MarkWest due to winter weather and no slip policy)* | $6,456,985 |
| Additional costs (coordination, potholing, winter weather conditions*) (markup only applied to winter conditions) | $3,340,768 |
| Total Costs Before Markup Applied | $28,303,383 |
| Total Costs with Markup of $5,901,902 | $34,205,285 |

¶ 36    The jury's damage award loosely aligns with Baker's testimony about how (and in what amount) MarkWest's actions damaged Dyess after the contracts were signed.

¶ 37    As mentioned, and as McRaney testified, section 3.18 of each contract contemplated that the parties would negotiate an adjustment for changes to the scope of work.  Dyess asked for an adjustment, but MarkWest repeatedly refuted, ignored, or delayed Dyess's efforts to negotiate for the additional labor and materials Dyess provided.

¶ 38     A party may recover for unjust enrichment if "substantial changes occur that are not covered by the contract and are not within the contemplation of the parties, and when the effect of such changes is to require extra work or to cause substantial loss to one party." *Specialized Grading Enters., Inc.*, 181 P.3d at 354-55; *see also V.C. Edwards Contracting Co. v. Port of Tacoma*, 514 P.2d 1381, 1386 (Wash. 1973) (applying the same principle and noting that "[t]he critical factor . . . is whether the [party] should have discovered or anticipated the changed condition").

¶ 39     In *Specialized Grading Enterprises*, a subcontractor brought an unjust enrichment claim for extra work, and "[t]he contractor argued that the [extra work] . . . was expressly provided for in the general contract" and that the contract's change order procedure provided "an adequate contractual remedy." 181 P.3d at 355. A division of this court reversed the district court's entry of a directed verdict in the contractor's favor on the unjust enrichment claim, reasoning that (1) the parties did not follow the change order procedure; (2) the work the subcontractor performed was the contractor's responsibility; (3) "[t]he subcontractor could not have reasonably anticipated that the contractor" would not perform; and

18

(4) "the contractor was aware of the problem and the subcontractor's efforts." *Id.* at 356.

### 1. Evidence Supporting a Quantum Meruit Recovery

¶ 40 As noted, the contracts were executed in August 2017, but the inadequacy of the number and availability of the inspectors MarkWest provided was evident only *after* the contracts' effective date. Relatedly, Michael Hoy (MarkWest's construction manager) testified that he was immediately under pressure to keep costs down for his portion of the overall project and that the operations budget (which funded the inspectors) was reduced to serve that directive. Not only were there insufficient inspectors, but the few inspectors were not available when and where Dyess needed them. Indeed, Hoy admitted he was aware of the coordination and communication challenges.

¶ 41 As mentioned, MarkWest implemented the no slip policy after the workplace fatality in December, well after the contracts' effective date. Once the policy was in effect, MarkWest largely dictated when Dyess could work. Dyess employees testified they could not have reasonably anticipated losing so many workdays. Moreover, according to McRaney, Dyess's proposal contemplated

approximately five days of adverse weather, but actual rainouts were closer to thirty-seven days.

¶ 42    Neither the contracts nor the parties contemplated the extent of work stoppages or all the difficulties they would later encounter. *See id.* at 354-56. Dyess always expected to finish most of its work before winter. However, the delays required Dyess to work into and past the winter season, when conditions made the work more challenging and more expensive. *See, e.g.*, *George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 239 (2005) (recognizing that construction "during winter months may be more expensive than the same work performed during temperate weather"). Indeed, Hoy warned that further delays would result in increased construction costs for winter work.[8]

¶ 43    It is true that MarkWest presented evidence to argue that not all of the delays were directly attributable to it. For example, MarkWest presented evidence of as many as twenty-one incidents as of December 12, 2017 — ranging from suspected drug ingestion

---

[8] MarkWest issued its first bid on May 11, 2017, but it had to re-bid later that summer because no company bid to complete the challenging spread 1.

by untrained Dyess crew members to a piece of heavy equipment tipping into a ditch — requiring work stoppages, arguing it should not be faulted for them. It is also unclear whether Baker's analysis accounted for (1) the $189,168 MarkWest paid for the clearing subcontractor who was on standby pending resolution of the land access issues; (2) the portion of the work MarkWest removed from Dyess — the hot tap work — and assigned to a different contractor (with no corresponding reduction in Dyess's compensation); (3) the $500,000 MarkWest paid to Dyess for the safety training it required in January 2018 (after the fatality); (4) inefficiencies generated by Dyess personnel changes;[9] and (5) MarkWest's expenditures associated with locating and fixing a Dyess-installed leaky pipe. Working into the winter contributed (in part) to some of the incidents, but, as noted, some of the trial evidence may have

---

[9] For example, (1) Steve Greenway, Dyess's superintendent, felt the strain of the project and asked to be re-assigned to a different project, so, effective December 4, 2017, Jody Broom replaced him; (2) Dyess fired a supervisor for leaving his post; and (3) three laborers disappeared to avoid drug testing. Worker shortages in the area forced Dyess to hire some inexperienced crew. That inexperience showed in the various incidents.

suggested that fault for each work stoppage could not be laid solely at MarkWest's feet.

¶ 44 To the extent there was conflicting testimony about what the parties viewed as included in the contracts' scope and the cause of delays, however, we must defer to the jury's assessment of witness credibility and conflicting testimony. *See Vaccaro v. Am. Fam. Ins. Grp.*, 2012 COA 9M, ¶ 34; *see also Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 2015 COA 82, ¶ 34 (appellate court will review the entire record to determine if there "is competent evidence from which the jury logically could have reached its verdict"). Indeed, we may not disturb the jury's determination of the amount of damages unless it has *no* record support, which is not the case here. *See Averyt*, 265 P.3d at 462; *Hildebrand*, 252 P.3d at 1170. Nor does the jury's verdict clearly and definitely show that it ignored the court's instructions or undisputed evidence, or that it was motivated by improper considerations. *See Martinez*, 109 P.3d at 992; *see also Averyt*, 265 P.3d at 462-63.

¶ 45 As a result, we cannot say that the remand court erred by concluding that the record supported Dyess's unjust enrichment claim. *See Alderman*, ¶ 37.

## 2. Change Orders and Quantum Meruit

¶ 46  We next engage with MarkWest's argument that Dyess had to follow the change order process to recover labor or material costs. The record reflects that MarkWest selectively ignored Dyess's change order requests. Significantly, MarkWest observed Dyess performing the now-challenged work without objecting or requesting change order submittals before the work proceeded. *See Jarosz v. Caesar Realty, Inc.*, 220 N.W.2d 191, 193 (Mich. Ct. App. 1974) (allowing recovery for unjust enrichment, notwithstanding a change order provision, "because defendants were aware of and authorized changes . . . [and] had either waived th[e] [change order] requirement . . . or [the] requirement did not extend to extra work").

¶ 47  So MarkWest knew of its right to request and receive change orders, but it selectively ignored the change order process — or simply refused to pay Dyess — for the work it now claims required change orders. On these facts, we cannot say that the jury erred by effectively concluding that MarkWest waived its right to rely on the change order process (after all, the jury agreed Dyess was entitled to quantum meruit damages). *See Tarco, Inc. v. Conifer Metro. Dist.*,

2013 COA 60, ¶ 33; *Avicanna Inc. v. Mewhinney*, 2019 COA 129, ¶ 25.

¶ 48　　But whether a party waived a contractual provision and whether such waiver entitles the other party to pursue an unjust enrichment claim are different questions.  The rationale underlying "waiver as an excuse for nonperformance . . . is based in large part on the policies against . . . unjust enrichment."  13 Richard A. Lord, *Williston on Contracts* § 39:15, Westlaw (4th ed. database updated May 2025).  Therefore, waiver of a contractual right generally precludes the waiving party from "seek[ing] judicial enforcement of the contract with regard to the waived performance."  *Id.*; *see also Assocs. of San Lazaro v. San Lazaro Park Props.*, 864 P.2d 111, 111, 115-16 (Colo. 1993) (holding that a breach of warranty action should have been dismissed where the party claiming breach waived the right to rely on the contract's warranty).

¶ 49　　Thus, because courts will not enforce waived provisions, we conclude that waiver is sufficiently analogous to the provision having failed that it satisfies the exception under which a party to an express contract may seek restitution for unjust enrichment when the contract (in whole or in part) fails or is rescinded.  *See*

*Alderman*, ¶ 37. When a party waives a contractual provision that could otherwise block an unjust enrichment claim, the waiving party can no longer rely on that provision, even if the contract as a whole has not failed.

¶ 50  We also conclude that waiving a contractual provision is distinguishable from the circumstances in *Alderman*. There, Alderman and other students sued Colorado State University (CSU) to recover tuition and fees after the university transitioned to remote services during the COVID-19 pandemic. *Id.* at ¶¶ 7-11. Although the students "contracted for an in-person education," a "statutory provision . . . granted CSU the authority to suspend university operations in the event of 'the prevalence of fatal diseases, or other unforeseen calamity.'" *Id.* at ¶¶ 10, 41 (quoting § 23-30-111, C.R.S. 2024). Because the statute was "incorporated into the parties' contract, meaning that the contract explicitly allowed the university to temporarily suspend operations," the court concluded that Alderman could not bring an unjust enrichment claim. *Id.* at ¶¶ 38, 41, 44.

¶ 51  The *Alderman* court held that the statutory provision — which became part of the contract — did not render the contract (or any

portion of it) unenforceable. *Id.* at ¶¶ 4, 41. It reasoned that Alderman's inability to state a claim for breach of contract due to the statutory provision differed from the contract being unenforceable. *Id.* A contract fails, the court held, "when it becomes legally unenforceable," not when "it does not provide all the services and protections to which a party claims they are entitled." *Id.* at ¶ 40. Thus, although the contract was silent as to CSU's obligation to issue refunds when it transitioned to remote services, the court held that unjust enrichment is not "a gap-filler provision to provide a remedy when a contract is silent about a desired term." *Id.* at ¶¶ 16-17, 43.

¶ 52 In *Alderman*, the statute effectively created an explicit contractual exception to the requirement that CSU provide in-person services. So Alderman could not sue for breach of contract or unjust enrichment because an express provision of the contract allowed the allegedly prohibited conduct. By contrast, waiver is not an explicit provision or exception that becomes part of a contract; instead, it effectively eliminates the waived provision. In short, Alderman's claims were barred because there *was* an express

26

provision, while a waiving party cannot enforce or rely on an express provision that it has disavowed.

¶ 53    Just as a contract's failure or rescission creates an avenue for unjust enrichment recovery because there are no enforceable contractual provisions, waiver results in the waived contractual provision becoming legally unenforceable.  *See id.* at ¶ 40; 13 *Williston on Contracts* § 39:15.  Waiver is also different from the parties omitting a term from their agreement, *see Alderman,* ¶ 43, because the parties contemplated the term, but it failed.  Allowing claims for unjust enrichment when a contractual provision fails or is rescinded is not the same as allowing unjust enrichment claims to serve as a gap-filler for overlooked terms.  *See id.*  Otherwise, the exceptions discussed in *Alderman,* ¶ 37, would be meaningless.

¶ 54    The parties' contract *originally* provided a contractual way for Dyess to be compensated for its additional work: it could (1) submit change orders or (2) negotiate an adjustment pursuant to section 3.18.  Admittedly, MarkWest honored the first few change orders.  But witnesses testified that Dyess tried to submit other change orders and MarkWest largely ignored or otherwise rejected Dyess's later change order submittals.  MarkWest's waiver meant that there

was *no longer* an enforceable contractual provision covering out-of-scope work, and any such work fell outside of the contract. *See id.* So to the extent the disputed work and materials were subject to a change order requirement, the jury could have reasonably concluded that MarkWest's waiver of these sections allowed Dyess to recover under unjust enrichment.

¶ 55 Relatedly, MarkWest also posits that any quantum meruit recovery was necessarily limited by Jury Instruction 60 and Dyess's counsel's purported concession that the damages sought under that instruction were under a million dollars.[10] Dyess rejects any such limitation.

¶ 56 The plain language of Jury Instruction 60 shows that it did not limit Dyess's potential quantum meruit recovery to costs associated with the limited specific examples of extracontractual work it provided. Jury Instruction 60 explicitly stated that "[d]epending on your findings, items not covered by the contracts

---

[10] MarkWest also consistently claimed that Dyess could not advance multiple theories of recovery, but Colorado law allows a party to advance multiple theories of recovery while allowing for only one monetary recovery. *See Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 860 (Colo. App. 2007).

and not within the contemplation of the parties include items *such as*: slip work, drains, timber mats, rock ditch, extra spool piece at the kickoff, and test leads misfire work." (Emphasis added.) The "such as" language plainly shows Jury Instruction 60 did not explicitly limit Dyess's quantum meruit damages to costs related to the enumerated specific examples.[11]

¶ 57     From the jury's verdict *and* award, it is evident that the jury found that MarkWest received substantial value from work and materials Dyess provided. The verdict also shows that the jury rejected MarkWest's theory — reiterated several times during trial — that, by accepting the first extension to the completion schedule and a lower payment, Dyess waived any claim that it was owed more. And the jury's verdict shows it rejected MarkWest's repeated suggestion that Dyess accepted the $3,000,000 MarkWest offered after Dyess demanded $7,500,000.

---

[11] Moreover, because MarkWest represented to the remand court that it did not seek a new trial "based on an erroneous instruction," specifically referencing Jury Instruction 60, it cannot complain of the instruction now. *See Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 25 ("[A]rguments never presented to, considered by, or ruled upon by a district court may not be raised for the first time on appeal.").

¶ 58    Collectively, because evidence in the record supports the jury's quantum meruit damage award, we may not second-guess the jury's decision. *See Averyt*, 265 P.3d at 462; *Hildebrand*, 252 P.3d at 1170. We therefore affirm the remand court's judgment denying MarkWest a new trial and affirm its netted quantum meruit damages award of $21,539,641.

## IV.   Disposition

¶ 59    The judgment is affirmed.

JUDGE GOMEZ and JUDGE HAWTHORNE concur.